[No. 865.]

## GEORGE KENNEDY ET AL., RESPONDENTS, *v.* S. SCHWARTZ, APPELLANT.

CONTRACT FOR THE SALE OF ORE CONSTRUED—ASSAYS TO BE SAMPLED WHEN.—In a contract for the sale of ore at prices regulated by the assay value per ton, and the ores delivered to be paid for monthly: *Held*, that the assays of the ore were to be averaged at the end of each month, and not taken in separate lots and quantities as delivered.

IDEM—NON-COMPLIANCE OF TERMS OF A CONTRACT—AMOUNT TO BE RECOVERED.—The plaintiff agreed to deliver to defendant one thousand tons of ore within three months. The defendant, on his part, agreed to pay for each one hundred tons, as soon as delivered, one thousand dollars. In an action brought to recover the value of the ores delivered to the defendant: *Held*, that if the defendant had failed to comply with the provisions of the contract, the plaintiff would be entitled to recover the full contract price of all ores delivered; but if the plaintiffs had failed or refused to comply with its terms, they could only recover for each and every one hundred tons of ore indivisible, and would be liable for damages, if any were sustained by reason of their non-compliance with the terms of the contract.

APPEAL from the District Court of the Sixth Judicial District, White Pine County.

The facts are stated in the opinion.

*J. B. Barker*, for Appellant.

*R. D. Ferguson*, for Respondent.

By the Court, HAWLEY, C. J.:

The plaintiffs, Kennedy and Young, on the fourteenth of August, 1876, were the owners of the Crown Point and Vulcan mines, situate in Hunter mining district, White Pine county. The ores in the Crown Point mine were of high grade in silver, and of low grade in lead. The ores in the Vulcan mine contained a heavy per cent. of lead, but were of low grade in silver, and were valuable to be used as a flux in the smelting of other ores. The defendant, Schwartz, was the lessee of a smelting furnace at Robinson, and was desirous of procuring ores that would enable him to run the furnace with profit.

After examining the character of the ores in the Crown Point and Vulcan mines, negotiations were entered into which resulted in the making of a written contract, by the terms of which the plaintiffs, as parties of the first part, agreed to deliver to the defendant, as party of the second part, within three months after the first day of September, A. D. 1876, at the dumps of said mines, one thousand tons of ore, to be assorted upon said dumps by defendant, on the following conditions, viz.: "1. For all ores delivered, ten dollars per ton in gold coin of the United States; 2. For all of said ores so delivered which have or show an assay value over or in excess of sixty dollars per ton, said second party shall pay to said first parties one half of, or fifty per cent. value of said excess over and above said sixty dollars value, in addition to the ten dollars per ton aforesaid. 3. For all lead ores which assay over thirty per cent. value per ton, said second party shall pay to said first parties twenty-five cents for each per centum of value in excess of said thirty per cent. of assay, and pay the same in gold coin of the United States."

The defendant, on his part, agreed to purchase, receive and pay for said one thousand tons of ore, as follows: "1. For each one hundred tons delivered, so soon as delivered, the sum of one thousand dollars, gold coin of the United States. 2. For any excess of value, as above set forth, over and above the said ten dollars per ton, said second

party shall pay the same to said first parties on the first day of each and every month during and after this agreement."

The defendant also agreed to take " all fine or powdered ores now on the Crown Point No. 2 dumps, without further assorting, at ten dollars per ton gold coin," and bound himself " to take all ores which may be assorted by his men and placed upon said dumps." It was further agreed that " the assay value of all ores may be taken by both parties to this contract, and all differences in the same shall be settled and adjusted by dividing the same between the two in the ratio of said differences."

This action was brought to recover a balance claimed to be due upon the value of four hundred and seventy-nine and eight hundred and eighty-nine two thousandths tons of ore which it is alleged the defendant received and smelted in his furnace.

1. In order to decide some of the questions presented by this appeal, it is necessary to determine whether, under the written contract, the assays of the ore were to be averaged at the end of each month, or whether the assays were to be taken and the value of the ore ascertained in separate lots and quantities as delivered.

The language of the contract is not free from doubt, and to enable us to determine its meaning, we must look at the relative position of the parties at the time the contract was made, and consider the object they had in view. In other words, the contract must be interpreted by a consideration of all of its provisions with reference to the general subject to which they relate, and in the light of the contemporaneous facts and circumstances, so as to arrive at the intention of the parties at the time the contract was entered into. When so interpreted, it seems to us that it was the intention of the parties that assays of all the ore delivered under the contract for each month should be taken and averaged, and that the payments for excess of value over and above sixty dollars per ton should be paid on the first day of the succeeding month. This payment to be in addition to the payments of one thousand dollars for each and every one hundred tons at ten dollars per ton, as specified in the contract.

Any other construction would leave the results purely accidental. It is shown by the testimony that some of the ore from the Crown Point was very fine powdered ore, and it was sampled and assayed from the sacks when delivered at the furnace, while other portions of the ore were coarse and had to be put through a rock-breaker before being shoveled into the furnace, and the samples and assays of the coarse ores were generally taken after the ore was crushed by the rock-breaker. The powdered ore was richer than the coarse ore. One lot of ten tons of the fine powdered ore had an assay value of one thousand four hundred and forty-nine dollars and eighty cents in excess of the sixty dollars per ton, while one lot of seven tons of the coarse ore had an assay value of one hundred and sixty-one dollars in excess of the sixty dollars per ton. There is nothing in the contract to the effect that the fine powdered ore should be sampled and assayed separate from the coarse ore, or that the samples and assays of the ores from the Crown Point should be kept separate and distinct from the ore from the Vulcan, or that settlements should be made for each and every ton of ore that assayed over sixty dollars per ton, independent and exclusive of the value of other ores that did not assay sixty dollars per ton. The ores seem to have been sampled and assayed in separate lots as taken from the wagons for convenience sake only, and the ores from the Crown Point and Vulcan were kept in separate piles simply to enable the workmen to properly feed the furnace with the different qualities of ore. Several samples were taken and assays made from the ore of the respective mines prior to the signing of the contract. The ores in the Vulcan assayed from nine to ninety dollars per ton in silver, the general average being in the neighborhood of thirty dollars per ton, while the assays of the Crown Point ore averaged about one hundred dollars per ton.

The prevailing idea to be gathered from the language of the contract, as well as from the acts of the parties, seems to be that all the ores delivered would average about sixty dollars per ton. If the average was less it was the defendant's fault, as the privilege of employing assorters to assort

the ores was left to him.   If the ores averaged more than sixty dollars per ton, the plaintiffs were protected by the clause allowing them a certain percentage of the excess.

The conclusions reached by the court below in allowing the plaintiffs to recover the assay value of the separate lots of ore that assayed over sixty dollars per ton, without taking into account the general average of all the ore received during the month, is at variance with the views we have expressed, and necessitates a reversal of the judgment.

2.  The third finding of the court, to the effect that E. K. Phipps was assayer for both parties is not sustained by any evidence.   He was weigher for both parties; but as assayer of the ores delivered under the contract, he acted solely for the plaintiffs.

3.  All differences as to the assay value of the ore were settled and adjusted as provided for in the contract, or otherwise agreed upon by the respective assayers, except one lot of one hundred and fifteen tons.   There is some testimony tending to show that the assays of this one hundred and fifteen tons were not adjusted, for the reason that neither Cook, the assayer, nor defendant, nor any of his agents, would agree to any such settlement.   If, upon a new trial, the weight of evidence sustains this view, it would be the duty of the court or jury to accept the assay of Phipps, if proven to be correct.   Neither party ought to reap any benefit by a failure or refusal to comply with the terms of the contract.

4.  If the court or jury should find as a matter of fact that plaintiffs were ready and willing at all times to deliver ores to the defendant in accordance with the terms of the contract, and that defendant failed to comply with its provisions, they would be entitled to recover the full contract price for all ores delivered.   But if, on the other hand, as defendant contends, the weight of evidence shows that defendant was ready and willing to receive the full one thousand tons, and the plaintiffs, notwithstanding the capacity of the mines to enable them to comply with the terms of the contract, failed and refused to furnish or deliver the ore, they could only recover for each and every one hundred tons of ore

indivisible, and would be liable to defendant for all damages, if any, he sustained by reason of their failure to comply with the contract.

5. The remaining questions which have been argued on this appeal, as to whether there was a verbal agreement changing the written contract so as to specify the proportion of ores to be delivered from the respective mines; or as to the percentage that should be allowed in making the assays, for the shrinkage or dryage of the ores; or in any other particulars, as claimed by defendant, cannot be considered under the present state of the pleadings, as both parties rely solely upon the express terms of the written contract. If, however, the pleadings should be amended in this respect (and it would be the duty of the district court to allow such an amendment if properly asked for), then these questions should be determined in accordance with the evidence that may be offered upon a new trial; the burden of proof resting upon the party seeking to establish any verbal modification or change of the terms of the written contract.

The judgment of the district court is reversed and the cause remanded for a new trial.