## MENDOTA COAL & COKE CO. v. EASTERN RY. & LUMBER CO.

### No. 6271.

Circuit Court of Appeals, Ninth Circuit.

Oct. 13, 1931.

Charles A. Hart and Carey, Hart, Spencer & McCulloch, all of Portland, Or., and Dysart & Ellsbury, of Centralia, Wash., for appellant.

C. D. Cunningham, of Centralia, Wash., and Edwin H. Flick and Herald A. O'Neill, both of Seattle, Wash., for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

On September 2, 1905, appellee, Eastern Railway & Lumber Company, leased to P. H. Smith and Alexander McLaren, for a term of ninety-nine years, 8,000 acres of land in Lewis county, Wash., for the purpose of exploration for and development and mining of coal and other minerals. These lands are on the Northern Pacific Railroad, about one hundred miles from both Portland and Seattle, about fifty miles from Tacoma, and about thirty-five miles from Olympia. In 1907 the lessees, Smith and McLaren, assigned the lease to appellant, Mendota Coal & Coke Company, a corporation which they and others had formed; and appellant has been in possession of the property ever since.

The obligation of the lessees, and of appellant as their successor, was to enter upon the premises and to prospect for coal, oil, and other mineral products, and to "mine, remove, sell * * * all coal, oil and other mineral products upon or under said land." The lease contained the further provision that "the mining and selling of coal under this agreement shall be conducted and prosecuted in an ordinarily prudent and businesslike manner." No minimum production was provided for, nor does the lease contain any requirement for continuous mining operations, the lessees being obligated simply to pay as rental certain royalties on any coal and oil produced and sold, and a percentage of the net value of any precious metals recovered.

The Mendota mine was opened several years after the execution of the lease in 1905. Actual mining of the coal commenced in 1909. Shafts and passageways were constructed so

that the mine had a capacity of 1,000 tons of coal a day when completed. There were also constructed a tipple house, washer, and all the usual equipment necessary to a coal mining operation of this size. Immediately adjacent to the mine was established a town which included a railroad station, store building, hotel, and more than thirty-five dwelling houses for employees. Later a generating plant was erected for the purpose of providing electric power for the mining operation. The capital investment represented here amounted to several hundred thousand dollars.

About the same time the stockholders of the appellant company organized a common carrier railroad, and at a cost of $167,000 constructed a railroad from Centralia to the Mendota Mine. This railroad was sold to the Northern Pacific Railway Company in 1917.

During the period from 1909 to 1919, inclusive, 995,441 tons of coal were loaded and shipped from all of the mines in the locality, and of this total 534,050 tons, over half of the total, were shipped by appellant. Except for the Washington Union Mine, operated primarily to provide fine or slack coal for the Union Pacific System, the Mendota mine is the only large mine in the particular field. The attached table[1] gives an account of the production of the Mendota Mine from 1909, the total production of Lewis county for the same period, the royalties paid to the railroad company on the total production,

and the taxes paid by the railroad company on the leased acreage.

During the period from 1909 to 1919 the sales manager of the coal company built up an organization of dealers in Washington and a wide distribution was achieved not only in Washington but also in northern Oregon, and to some extent in California and Canada.

During the latter years of the war and until May, 1920, the price paid for coal, the wages paid to miners, and to a certain extent the market in which coal might be sold, were regulated by the government. In 1919 wages were increased 14 per cent. without any increase in the price of coal. During the period of increased wages appellant lost from $3,000 to $4,000 per month. In May, 1920, government regulation ended and labor troubles began. There was a temporary shutdown in 1920 due to labor troubles, and in March, 1921, a statewide strike was called that lasted until June, 1923. During most of this time, until November, 1922, the Mendota Mine was completely shut down. During the labor troubles in 1920, 1921, and 1922 the smaller mines were not affected and the output of all the mines remained well above the pre-war level. In 1922, when appellant's mine operated for only two months, the output of the field was 25,000 tons above the record for any previous year.

Since 1920 the market for coal in the northwest has been cut into by the widespread domestic use of automatic self-feeding oil burners. During the war the oil companies, as did the coal companies, produced to full capacity, and when the war ended there were large quantities of fuel oil in storage for which a market had to be found. The perfection of the automatic oil burner in 1920 opened a new source of demand for oil, with consequent injury to the demand for coal. Appellant's output contains a large amount of slack coal, and prior to 1920 this coal was sold to steam plants, railway shops, and industries in nearby cities; twenty or more logging concerns in Western Washington were customers for this coal. Between 1923 and 1926 all of these customers changed to oil, and appellant found no steady ready made market for its fine coal.

When appellant resumed business after 1922, it found that its former markets had been taken by other companies. With all these difficulties appellant kept its mine in operation from November, 1922, until the summer of 1926, trying to find a market. From 1920 on the stockholders of the company voluntarily advanced $125,000 which

[1]

| | Tons of coal produced in Lewis County | Tons of coal produced by Mendota Coal Company | Royalties paid to the railroad company | Taxes paid by the railroad company |
|---|---|---|---|---|
| 1909 | 66,180 | 26,947 | $3,262 56 | |
| 1910 | 107,673 | 56,929 | 4,972 83 | |
| 1911 | 101,716 | 55,399 | 4,865 78 | |
| 1912 | 87,583 | 68,389 | 4,147 11 | |
| 1913 | 87,662 | 61,949 | 4,183 37 | |
| 1914 | 58,985 | 41,778 | 2,434 64 | |
| 1915 | 57,853 | 36,729 | 2,396 38 | |
| 1916 | 84,694 | 47,597 | 2,997 64 | |
| 1917 | 101,019 | 49,614 | 3,667 92 | |
| 1918 | 138,600* | 60,302 | 4,019 57 | |
| 1919 | 104,076*† | 28,457 | 2,022 66 | |
| 1920 | 126,602*† | 9,050 | 711 47 | |
| 1921 | 124,589*† | 682 | 50 53 | |
| 1922 | 163,168*† | 1,220 | 30 06 | |
| 1923 | 99,486 † | 6,707 | 482 90 | $1,988 33 |
| 1924 | 90,442 † | 3,917 | 271 70 | 1,432 63 |
| 1925 | 69,029*† | 7,248 | 471 06 | 1,449 49 |
| 1926 | 56,620* | 795 | 135 12 | 1,647 84 |
| 1927 | 50,691* | | | 1,681 41 |
| 1928 | 45,916* | | | 1,310 56 |

*Two operating coal companies enjoy a tonnage of approximately 5,000 tons per year, non-competitive business during years shown.

† 1919–1925 inc.—approximately 60,000 per year supplied to Government; business then lost to this field.

was used in operating expenses and the effort to develop a market for the output. This sales effort consisted largely in trips by the sales manager to various concerns that had formerly been customers, and in talking over conditions with new prospects. It is significant that appellant company has spent $15.75 for direct advertising since 1918, in contrast with $11,000 spent between 1909 and 1918. There is record of several deals pending, of several that "almost" came through, but no record of any successful contracts.

Finally, in the spring of 1926 operations were discontinued for the summer; and when fall came appellant decided to delay resumption of operation pending the time when some plan could be evolved for disposing of the slack coal. From the latter part of 1926 until May, 1929, when appellees undertook to terminate the lease, operations were completely suspended.

Appellant has maintained a night watchman on the property since that time and has kept machinery like the electric power plant under lock and key. However, it has allowed the houses in the town site to fall into a bad state of disrepair, rails have been taken up, and mine cars have been left out in the open and their floors allowed to rot, smokestacks have fallen, and the general impression of the property is one of abandonment. The mine has been flooded and has been so for several years.

Appellee, in May, 1929, brought suit to cancel the lease on the following grounds: (1) Failure by appellant to mine and market coal continuously for a period of several years; (2) alleged abandonment of the project; and (3) alleged acts of waste. When the testimony was closed on January 14, 1930, the court in an oral opinion upheld appellees' contentions and issued a decree canceling the lease and granting in full the relief sought by appellee. From that decree comes this appeal.

Appellant contends that it was necessary for plaintiff to give notice of intention to forfeit before the actual filing of the suits, but we cannot so hold. We think the rule is stated correctly in 9 C. J. at page 1207: "Where rescission is sought in equity the rule of the best considered cases is that notice of disaffirmance is not a prerequisite to relief, but that the institution of the suit constitutes sufficient notice of complainant's election to rescind the contract, and no prior notice need be given."

It is true that in cases where, for example, the lease has provided for the payment of a stipulated rental or minimum royalty by the lessee and the same has been received by the lessor without objection, it would be inequitable to decree a cancellation of the lease until the lessor has been given notice of his intention to refuse rent and demand that the lessee develop. Bertram Developing Co. v. Tucker, 191 Ky. 9, 228 S. W. 1027; Ohio Oil Co. v. Hurlbut, 7 Ohio C. D. 321; Johnson v. Armstrong, 81 W. Va. 399, 94 S. E. 753. In the instant case there was no such condition. No rental was paid; no royalties had been paid since 1926; the physical condition of the plant and the appearance of the property would give rise to a strong presumption that there had been an abandonment of the property, and the court so found.

Where, as here, a lease is entered into with no provision for minimum royalties required, there must necessarily be a strong implied obligation for the lessee to develop and mine the coal diligently and continuously. "While the rights granted are without limit as to time, and the agreement contains no express covenant as to how the mines shall be worked, or that any specified amount of ore shall be taken out, it does not follow that the appellants were at liberty to operate the mines or not as they saw fit. It was evidently the intention of the parties that they should be worked with reasonable diligence, and that would depend largely on the circumstances. The quantity and quality of the ore, and the demand that existed from time to time, would necessarily enter more or less into the question of due diligence. If the ore proved to be abundant and of good quality, and the demand was such as to justify a vigorous prosecution of the work, the spirit of the agreement manifestly required that it should be so worked." Koch's Appeal, 93 Pa. 434. Here, of course, appellant contends that "the quality of the ore, and the demand that existed from time to time" were not sufficient to justify operation of the mine, but such factors must be judged objectively from the light of the facts in the record in the instant case, and cannot be held to justify cessation of production whenever conditions became slightly more difficult than they had been in the prosperous years immediately before 1920.

The fact that the lease was for ninety-nine years, instead of for some shorter time, does not make the five years in which appellant has not paid any royalties or worked the mine at all any the less important from the point of view of the appellee, who has paid out in taxes for the last ten years more

than eight times the amount of the royalties during the same period. The last five years have given a good indication of what appellee may expect for the duration of the lease and served to warn him that some change in the status must be made.

In 18 R. C. L., § 98, we find: "Such a covenant to pay a royalty upon coal mined, if it be discovered, or to prospect for a mine to discover the same is in the nature of a condition, and lessee must proceed with and persist in reasonable diligence, and continuity of effort, and such a lessee has no option to work or not to work a mine for an indefinite time where there is a royalty reserved, and this is particularly true where there is no minimum quantity to be gotten out or minimum royalty to be paid." Rorer Iron Co. v. Trout, 83 Va. 397, 2 S. E. 713, 5 Am. St. Rep. 285. See, also, Howerton v. Kansas Natural Gas Co., 81 Kan. 553, 106 P. 47, 34 L. R. A. (N. S.) 34; Shenandoah Land & A. Coal Co. v. Hise, 92 Va. 238, 23 S. E. 303.

The implied covenant in the lease then, and the fact that appellant has done nothing at the mine for the past five years, are, we think, sufficient grounds for a suit for revocation of the lease without previous notice.

Appellee contends that the obvious insolvency of the appellant places the latter in such a position that it would be impossible for the Mendota Company properly to perform the covenants of the lease, and that this showing of insolvency alone should constitute a dissolution of the lease. In re Hinckel Brewing Co. (D. C.) 123 F. 942; In re Hays, Foster & Ward Co. (D. C.) 117 F. 879.

The trial court found: "That the said defendant is wholly insolvent and was so insolvent at the commencement of this action in that it had liabilities outside of its capital stock liability (which approximates $500,000) of about $125,000, being demand notes on which no interest has been paid for several years past, and that its sole assets consist of about $4,000 other than the mine building and townsite buildings, which are of little value in their present condition, and that said defendant company has not the means with which to carry on operations in said field." And this holding has substantial support in the record itself. We do not deem it necessary to pass upon the question of whether the financial sheet of the company and the insolvency that appears therein is sufficient of itself to warrant revocation of the lease, but the finding of the trial court was based upon conflicting evidence. We cannot say that

there was no substantial evidence supporting the finding, and we do not feel that we would be justified in disturbing the court's finding in that regard.

It is with the question of section 12 of the lease that we must deal at greatest length: "That the mining and selling of coal under this agreement shall be conducted and prosecuted in an ordinarily prudent and business like manner."

Such phrases are difficult of definition, and many different aspects must be considered; but we think the criteria are well set forth in the case of Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801, 814: " * * * The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him [the lessee] to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas [in this instance, coal] capable of being produced from the premises, * * * the local market or demand therefor or the means of transporting them to market, * * * and the usages of the business. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

We do not deem it necessary to go into a detailed discussion of the question of waste, but we think the finding of the trial court rests solidly upon the consensus of opinion of experts at the trial:

"This court finds that all this was bad engineering and bad mining practice [i. e., developing the old slope in such a way, with such meagre, adjoining and supporting pillars that they crazed and crushed at the footwall, thereby causing fire and heaving of the footwalls, making it necessary to abandon that area ten years ago, causing said area to flood with water and to cave in], making it impossible to win the pillar coal (which is the most profitable coal) in this area, approximating 106 acres, since as this court now finds the practice so followed rendered

said slope and said area unsafe and uneconomical of operation, and for ten years last past said area has been abandoned by defendant and cannot again be operated, all through the fault and careless mining methods adopted and used by the defendant."

"Further that defendant used such poor mining practice as to lose, because of recurring caving of the mine and crushing of weak pillars, from 40% to 50% of the coal in the area south of the new slope."

Appellant contends that conditions since 1920 have been such that failure of markets or lack of markets have prevented its operations and that it would be impossible to work the mine at a profit at the present time. In this connection the trial court found: "That during all of the time and while said lands were in possession of said defendant under said original lease contract and supplemental contracts thereto, said defendant should have, by the exercise of ordinary prudence and business ability, developed and operated said mine so as to produce continually a very large amount of coal, or an average of at least 200 tons per day for working days. * * * That the Mendota vein is as good as any among some eight mines in the field and that said field is equally distant (about 100 miles) from Seattle and Portland and has, and this court finds, that there were no physical difficulties in the way of mining said coal and that said defendant company had advantages in the matters herein recited not falling to the lot of many of the mines in this field, but which have operated almost continuously for many years past, and sold their output in the same market available to this defendant. * * *"

This finding was also based upon conflicting evidence and we do not feel disposed to disturb it. We will say, however, that it seems to have ample support in the record. This finding of the court is in effect a finding that the curtailment and suspension of mining constituted a failure to mine and sell coal in "an ordinarily prudent and business like manner."

When appellant says, "Although the Mendota mine as constructed had a capacity of a thousand tons a day, the demand in the peak years never justified production in that volume," it is relying upon a theory of "demand" that, classic enough in its enunciation by Adam Smith and Ricardo, must be modified in the light of present day interpretations. We no longer think of demand as something static, as something that continues to exist in a fixed quantity independent of outside influences. The doctrine was enunciated at a time when a producer had to consider only one thing, when his markets were ready made; to-day we realize that "demand" is a fragile thing that must be carefully nurtured, even for such a staple commodity as coal. In the case of coal the necessity is greater than in others, for that commodity no longer enjoys the quasi monopoly as a heating and power agent that it once had, but must prove its utility in competition with oil or electricity.

It may be true that even in the peak years appellant did not sell 1,000 tons of coal a day, but it cannot be truthfully said that there was no "demand" for that quantity, for the Mendota Company's output until 1919 was little over half the total output for the adjacent territory. To-day "demand" necessarily contains the idea of "competition" and a realization that markets are as much limited by sales efforts as by capacity to produce. We lay down no dicta as to the exact means by which the Mendota Company might have maintained its production, but we may judge its efforts in the light of ordinarily prudent and businesslike methods used by other companies in the same field. We think it significant that the president of the Mendota Company seemed surprised when asked if the Mendota Company had any retail branches or selling agencies; other companies in the same field had developed such organizations to market their products, with a considerable degree of success. It is no defense for a person, when asked by an interested party why his business has not been run for five years, to say that there was no market when his words mean only that he did not use the available means to reach the particular market involved.

The coal mined by the Mendota Company is of subbituminous grade, with fixed carbon from 36.90 to 40.52 per cent., ash content of from 7.88 to 11.45 per cent., and tar oil from 16.55 to 17.4 gallons. Using a 3-inch mesh, about 50 per cent. of the coal mined is fine coal, but the 3-inch mesh is much larger than that ordinarily used for this screening. In the years from 1909–1919, inclusive, 995,441 tons of coal were loaded and shipped from all of the mines of the locality of the Mendota Company, of which over half, or 534,050 tons, were produced by the appellant. The Mendota coal is about the same quality of the other coal produced in the neighborhood, and the only difference that could be noticed

is one in favor of the Mendota coal, namely, that the Mendota coal has an ash content of not more than 11.45 per cent., whereas the Bellingham coal, one of its strongest competitors in the domestic field, has an ash content of 21 to 23 per cent.

All was well until the war came, but after 1920, when strongly organized competition in the form of automatic oil burners came in, appellant company seems to have had the idea that "if we can't do business in the way we have done it in the past we won't do it at all." Before 1920 appellant had a strong organization of dealers throughout the Northwest; after 1922 when the strikes were finally settled and business conditions were worse, the sales force was cut and efforts slackened just when they should have been increased to overcome the setback. Before 1918 appellant spent some $11,000 in advertising; since 1918 they have spent only $15.

It may be true that the secret of profit in a mine with a high percentage of fine coal is in a profitable disposition of the fine coal itself, a product that is particularly in competition with oil. And it is true that the other competing companies have found an outlet for that product, either through use by subsidiaries or by contracts with large companies. Appellant has no such contracts and has no subsidiaries; it has made no effort to sell to such large buyers as the school systems of Seattle, Portland, and Tacoma; it has made no effort to turn its product into tar oil and briquettes, a process that would require some capital to start but that would probably prove profitable in the end. In short, appellant company has availed itself of none of the modern selling methods and methods of production that its competitors have used. It has not even introduced modern cutting machinery, and experts have testified that the production cost of the coal from this particular mine could be cut 50 cents a ton by the use of such machinery.

We need not rely upon the "market survey" that was made by witnesses Kelly and Green in which they said that dealers had told them that there should be a good market for Mendota coal; it is one thing for a merchant to say that a manufacturer's product is good, and it is quite another thing to get him to sign a contract for that particular product. We think it sufficient to show the conditions in the actual field around the Mendota Company's mine. The output of this district is now about 100,000 tons of coal per year, none of it better than the product of appellant.

From 1924 to 1929 the sale of subbituminous coal in Seattle has been raised to 300,000 tons a year. This sale is shared by the Cedar Mountain Mine, the Pacific Coast Coal Company, and the Bellingham Mine, the latter a mine with a large output situated exactly the same distance from Seattle as the Mendota Coal Company. These mines have not closed up because of the competition of the oil burners, rather have they redoubled their efforts and sold in a market that might, with proper business methods, have been that of the appellant company.

We think that the expense of only $15 for advertising since 1918 is particularly significant. It may be granted that in an ideal state, advertising, in so far as it involves "high pressure methods" to sell goods that the people do not want, or in so far as it simply adds to the selling cost of each of two articles that are of similar quality, might be eliminated. However, in our highly competitive economic organization to-day, advertising is and must continue to be an ever increasing factor in the success of any business. Appellant may have thought that it could market its product without advertising, but the last ten years have shown how the market has been lost when advertising was discontinued. Competitors, selling a product of no higher quality, have, through the power of sales campaigns, increased their sales or at least have held their own in competition with other products that have certain advantages in use.

We are not holding that increased advertising or the introduction of new machinery, or the establishment of retail sales agencies to push the sale of appellant's product, or the development of subsidiary companies to use a portion of the output that cannot otherwise be disposed of profitably, would any of them per se have restored conditions to the prosperous ones of pre-war days. We are not saying that each and every business should adopt one or all of these particular devices for improving the efficiency of a business; however, we uphold the finding of the trial court that the failure to do any of these things is indicative of a failure to conduct the business of coal mining "in an ordinarily prudent and business like manner." The trial court also found that the company was insolvent and that mining operations had been conducted in a wasteful manner. All of these findings, based on conflicting evidence, have ample support in the record and establish the equity of the cancellation of the

lease. It would be inequitable in the highest degree to tie up for seventy years the thousands of acres of land belonging to appellee, with no royalties therefrom now and no probability of any so long as the present situation continues, when other coal companies are making profits for themselves and paying royalties to the lessors with no greater advantage of production. We think that the cancellation prayed for should be granted, and the judgment of the lower court is affirmed.

Judgment affirmed.

WILBUR, Circuit Judge, concurs.