CANDELARIA INDUSTRIES, INC. and International Development Fund, by its General Partner Henry Von Kohorn, Sr., Plaintiffs,

v.

OCCIDENTAL PETROLEUM CORPORATION, Occidental Minerals Corporation, and Candelaria Partners, Defendants.

Civ. No. R–81–229 BRT.

United States District Court,
D. Nevada.

Aug. 8, 1984.

Order Denying Renewed Motion for Summary Judgment July 29, 1985.

Procedural Order Oct. 30, 1985.

Order on Motion to Join Necessary Party May 19, 1986.

Court's Statement of Subsequent Proceedings June 18, 1987.

Woodburn, Wedge, Blakey & Jeppson, Suellen Fulstone, Reno, Nev., and Willkie, Farr & Gallagher, David L. Foster, New York City, for plaintiffs.

Vargas & Bartlett, Reno, Nev., for Occidental Petroleum Corp.

Mitchell, Silberberg & Knupp, Los Angeles, Cal., for Arthur Groman.

Raymond J. Schlauch, Denver, Colo., and Earl M. Hill, Reno, Nev., for Occidental Minerals Corp. and Candelaria Partners.

## ORDER RESPECTING MOTIONS FOR SUMMARY JUDGMENT

BRUCE R. THOMPSON, District Judge.

In 1970, Candelaria Industries, Inc. (CI), a closely held corporation owned by Henry Von Kohorn, sold several mining claims which it owned in Nevada's Candelaria mining district to Thomas E. Congdon. The purchase agreement provided, *inter alia*, that CI reserved ten percent of the net profits derived by Congdon from the property. CI later sold seventy percent of its net profits interest to a partnership, International Development Fund (IDF).

Congdon's interest in the property was eventually transferred to a limited partnership, Candelaria Partners (CP). CP was comprised of Occidental Minerals Corporation (OM), a subsidiary of Occidental Petroleum Corporation (OP), as the general partner, and Congdon and Carey, Ltd., No. 4 (C & C4), as the sole limited partner. In the fall of 1979, a feasibility study was completed which recommended construction of a mine and recovery plant on the Candelaria property. Commercial production of minerals began in November of 1980.

Prior to production from the mine, silver had risen to record levels and, in January of 1980, OP entered into a series of short sales of silver and gold on the commodities exchanges. OP's trading agreement with Merrill Lynch stated that OP was acting as the agent of OM and CP and characterized the trading as hedging transactions. By late March of 1980, the price of silver had fallen dramatically. OP closed out the futures positions for a profit of approximately $120 million. As a result of the lower silver prices, mining operations stopped on the Candelaria property in 1982.

Following a refusal to share the profits made in the futures trading, CI and IDF brought this action against OP, OM, and CP alleging breach of covenant and breach of fiduciary duty. The parties have now submitted cross motions for summary judgment. CI and IDF have moved for partial summary judgment on the issue of liability asserting three grounds for recovery. OM and CP have also moved for summary judgment disputing the plaintiffs' entitlement to relief on any of the three theories advanced. OP has joined in the latter motion.

Although this is a diversity action, the Federal Rules of Civil Procedure apply. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Under Fed.R. Civ.P. 56, "[s]ummary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Clipper Exxpress v. Rocky Mountain Motor Tariff*, 674 F.2d 1252 (9th Cir.1982). The parties' cross motions do not change that standard. "It is well settled that a court's duty to ascertain whether facts remain in contention is not obviated by cross motions for summary judgment." *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 649 n. 4 (9th Cir.1974).

In contrast to rules of procedure, this court is bound to apply the substantive law of Nevada including its choice of law rules. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Despite some evidence that this case has contacts with other jurisdictions, such as execution of the purchase agreement in Colorado, neither party has argued that Nevada would look to another forum's law in order to resolve this controversy. Nor is there any indication that Nevada law would conflict with the law of any other state or that Nevada's choice of law theory requires application of foreign law. *See Hanley v. Tribune Publishing Co.*, 527 F.2d 68 (9th Cir.1975); Restatement (Second) of Conflict of Laws. Therefore, we will apply Nevada law or, where the Nevada Supreme Court has not addressed an issue, use our own best judgment to predict how the state court would

rule. *See Takahashi v. Loomis Armored Car Service*, 625 F.2d 314 (9th Cir.1980).

In the first of their three grounds for recovery, the plaintiffs assert that the net profits interest in the purchase agreement (Agreement) between CI and Congdon clearly entitles them to ten percent of the profits made from the commodity trading. The defendants argue that the Agreement clearly does not subject those sums to the plaintiffs' ten percent interest. Construction of the terms of a contract is a matter of law where, as here, the contract is unambiguous and there are no other factual issues. *See Castaneda v. Dura-Vent Corp.*, 648 F.2d 612 (9th Cir.1981); *Nevada Industrial Commission v. Dixon*, 77 Nev. 296, 362 P.2d 577 (1961).

A contract "must be interpreted by a consideration of all of its provisions with reference to the general subject to which they relate, and in light of the contemporaneous facts and circumstances, so as to arrive at the intention of the parties at the time the contract was entered into." *Kennedy v. Schwartz*, 13 Nev. 229 (1878). In this case, affidavits from both contracting parties have been submitted which indicate that they did not contemplate the effect of the net profits interest on futures trading. Therefore, we must look to the terms of the contract itself.

■ Section 4A of the Agreement, which defines the net profits interest, provides that:

> Candelaria hereby reserves a Net Profits Interest of Ten (10%) Per Cent of the net profits Congdon and/or his successors in interest (excepting such successors as may gain an interest in the Property through a partial reconveyance of an undivided interest in the Property to Candelaria) may gain from his activities described in Section 2 hereof on the Property . . . .

The activities described in Section 2 are:
> the exclusive right to enter and possess the Property and to explore for, develop, mine, remove, treat, reduce, ship and sell all ores and minerals on and under the Property in such manner and using such

methods (including methods hereinafter developed) as Congdon deems advisable, and to make such lawful use of the Property in exercising his rights granted hereunder as Congdon deems advisable.

Reading those two sections together, the plaintiffs contend that the hedging transactions constituted a sale of minerals or other lawful use of the property thus triggering the net profits interest. We cannot agree with that contention.

Section 4 of the Agreement reserves ten percent of the gain from activities *on the property*. Both that language and the language in section 2 describing the activities subject to the plaintiffs' interest clearly imply that the net profits interest only attaches to minerals actually produced from the property. Furthermore, the formula used by the Agreement to determine the amount of net profits contemplates actual production. Net profits are computed by deducting the costs of exploration, development, and production [1] from the proceeds of sales of minerals produced from the property or any other sales of property upon which such costs have been incurred.[2] Accordingly, the net profits interest is limited to profits realized through actual production of minerals from the property.

"Under well settled rules of contract construction a court has no power to create a new contract for the parties which they have not created or intended themselves." *Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 623 P.2d 981 (1981). We cannot rewrite the unambiguous terms of the Agreement.

■ The plaintiffs next assert that the defendants had a fiduciary duty which obligated them to share the profits from the commodities trading. A fiduciary duty has been found to exist where there is a special relationship beyond a bare royalty arrangement, such as unit development or an investment scheme. *See Young v. West Edmond Hunton Lime Unit*, 275 P.2d 304 (Okl.1954); *Differding v. Ballagh*, 121 Cal. App. 1, 8 P.2d 201 (1932). Some courts have held that the duty may also arise from an agreement that subsequent lease renewals remain subject to a royalty interest, *see Independent Gas & Oil Producers v. Union Oil Co.*, 669 F.2d 624 (10th Cir. 1982); *Hivick v. Urschel*, 171 Okl. 17, 40 P.2d 1077 (1935); *Probst v. Hughes*, 143 Okl. 11, 286 P. 875 (1930), or where there is an obligation to keep a permit alive, *see*

---

1. The costs to be deducted are listed by section 4A(a) of the Agreement as follows:

 (a) the sum of all costs and expenditures of whatsoever nature paid or accrued from the date of this Agreement forward in connection with Congdon's operations and activities directly related to this Agreement, including, without limitation, the cost of geophysical, geochemical, drilling and other exploratory activities; mapping; travel and field expenses; metallurgical tests; fees and expenses of consulting engineers or geologists not regularly employed by Congdon; mine, mill and smelter studies; mine development expense, whether underground or upon the surface of the ground; the cost of buildings, structures (including employees' housing), machinery, equipment and other capital items and improvements or additions to the same; salaries and wages and payroll expense related thereto and materials and supplies employed in mining and milling operations and repairs and maintenance; transportation of employees, supplies and product; rents and royalties; property damage and personal injury awards; the necessary cost of environment restoration; insurance; taxes (excluding federal or state taxes on net income of Congdon); interest and other financing costs in connection with money borrowed, if any, to finance development and operations; the payments required under Section 3 hereof and payments made to acquire other properties and mineral interests in the Area of Interest, excepting payments made to Argentum Consolidated Mines, Inc.; an overhead charge prior to commencement of production on a commercial basis equal to 125% of the salaries of employees of Congdon who are directly engaged with work of the foregoing nature or the planning thereof and an overhead charge following commencement of production on a commercial basis of $3,000.00 per month for Congdon's personnel not employed on the Property or the Area of Interest or at any mill relating thereto....

2. In the words of section 4A(b) of the Agreement, costs are to be deducted from:

 the net cash proceeds derived from the arm's length sale of ores, concentrates or other products produced from the Property, (excepting the properties and mineral interests of Argentum Consolidated Mines, Inc.), such other properties and mineral interests in the Area of Interest that Congdon may acquire and all sales of property of any character the cost of which has been included in subsection (a) above.

*Oldland v. Gray,* 179 F.2d 408 (10th Cir. 1950). In the usual type of royalty arrangement present here, however, the parties' only obligations arise from their contractual relationship and no fiduciary relationship is created. *See Garfield v. True Oil Co.,* 667 F.2d 942 (10th Cir.1982); *Honolulu Oil Corporation v. Kennedy,* 251 F.2d 424 (9th Cir.1957). Therefore, the plaintiffs' claims of breach of fiduciary duty are deficient as a matter of law.

The plaintiffs' final theory of recovery is that the defendants have breached their duty of good faith. That claim rests in the contractual relationship of the parties. There is "an implied covenant of good faith and fair dealing in *every* contract, that neither party should be permitted to do anything which will injure the right of the other to receive the benefits of the agreement." *Aluevich v. Harrah's,* 99 Nev. 215, 660 P.2d 986 (1983) (Springer, J., dissenting); *Fortune v. National Cash Register Company,* 373 Mass. 96, 364 N.E.2d 1251 (1977); Restatement, Second, Contracts § 205. *Idem.,* comment (d).

■ The plaintiffs argue that the defendants' decision to close out the futures contracts rather than fulfill them through production from the property was the result of a desire to avoid payment of the net profits interest. That argument is tied to the defendants' obligation to produce minerals from the property. Where, as in the present case, the agreement reserves a royalty but no minimum royalty payments are required, an obligation to develop the property is usually implied. *Mendota Coal & Coke Co. v. Eastern Ry. & Lumber Co.,* 53 F.2d 77 (9th Cir.1931). Section 14 of the Agreement provides, however, that:

> Nothing contained herein shall be construed to require Congdon to open or develop any mine or mines in the Property or to perform any exploration, development, or other work thereon, except as provided for in Section 7, at any time that Congdon in his discretion determines not to conduct such activities.

When such discretion is granted to an operator, he has "a power of decision as to working and operating the property which would represent a permissible judgment on the aspects of the situation as they existed at any particular time or period of time." *Oberbillig v. Bradley Mining Company,* 372 F.2d 181 (9th Cir.1967).

Nevertheless, an operator's decision to develop or not develop must not be made arbitrarily for "[i]nherent in the grant of a discretion—whether it be one of general, sole, or absolute discretion—whose exercise is capable of effect upon the grantor, is the responsibility of action 'in good faith.'" *Id.* at 184. In this case, there is evidence in the record that the futures contracts were tied to anticipated production from the property and that the defendants' purpose in entering the contracts was to guarantee higher prices for minerals produced from the property. That evidence raises questions of fact regarding the defendants' good faith in deciding to close out the futures contracts rather than complete them through delivery of minerals produced from the property and the case must proceed to trial on that issue.

An action for breach of the implied duty of good faith in performance is an action for breach of contract, not an action, ex delicto. *Fortune, supra.* The circumstances relied upon by the majority justice in *Aluevich, supra,* to distinguish *Fortune, supra,* do not apply here. Plaintiffs here were completely at the mercy of defendants with respect to how the transactions at issue would be consummated. We do not support plaintiffs' theories of breach of the royalty provisions of the contract, or of breach of fiduciary relationship which might have entitled plaintiffs to ten percent (10%) of the profits on the futures trading. We do find disputed issues of material fact on the claim of breach of the implied covenant of good faith and fair dealing. Damages for such breach are not computed at ten percent (10%) of the futures trading profits but on the hypothesis that the short sale contracts had been performed by production from the property.

In addition to the above arguments, OP contends that it should be dismissed, in any event, because it is named solely as an agent of a disclosed principal. The plain-

tiffs oppose OP's dismissal arguing that when an agent has received money from a third party to which his principal is not entitled, the agent is liable to the third party. As the parties' arguments imply, in order for OP to be properly joined in this action, there must be a right to relief asserted against it. Fed.R.Civ.P. 20(a).

■ The Wyoming Supreme Court has held that "[g]enerally, an agent to whom money is paid for his principal under circumstances that would entitle the payer to recover it back from the principal is individually liable to the payer so long as it remains in his hands and he has not changed his position." *Mader v. James*, 546 P.2d 190 (Wyo.1976). Here, however, the profits obtained by OP were not paid by the plaintiffs. Nor is there privity of contract or any other relationship between the plaintiffs and OP. Instead, OP's status in the action is solely that of a debtor of the other defendants.[3] That status is insufficient to permit joinder of OP under Rule 20. *See Intercon Research Associates, Ltd. v. Dresser Industries, Inc.*, 696 F.2d 53 (7th Cir.1982).

IT HEREBY IS ORDERED:

1. The motion of Occidental Petroleum Corporation for summary judgment is hereby granted.

2. The motion of the other defendants for summary judgment is hereby denied, but the issues in the case are limited in accordance with the foregoing opinion.

3. The plaintiffs' motion for partial summary judgment is hereby denied.

## ORDER DENYING RENEWED MOTION FOR SUMMARY JUDGMENT

The effort of defendants to persuade this Court that the Supreme Court of Nevada does not recognize the principle that in every contract there is an implied covenant that neither party should be permitted to do anything which will injure the right of the other to receive the benefits of the agreement falls on deaf ears.

The rubric "implied covenant of good faith and fair dealing" serves to obscure thought rather than to embellish it. This is particularly so in this situation where the phrase has been employed with respect both to actionable torts and breaches of contract.

The case of *Dalton Properties, Inc. v. Roscoe Jones*, 100 Nev. 422, 683 P.2d 30 (1984), is defendants' principle buttress to support their motion for reconsideration and renewed motion for summary judgment. That case simply holds that when a contract expressly states that it is terminable at will, that is what it means, *unless* "a special element of reliance exists between the parties." The opinion goes on possibly to equate special reliance with proof of unconscionability, oppression or intentional concealment." This probably helps clarify the law for some people.

This Court in its decision of August 6, 1984 cited *Oberbillig v. Bradley Mining Company*, 372 F.2d 181 (9th Cir.1967), which is directly in point. Plaintiffs have supplied a new precedent, *Seaman's Direct Buying Service, Inc. v. Standard Oil Company*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984), which is helpful and consistent with denial of summary judgment in this case.

Perhaps a recent unpublished determination from the Ninth Circuit will assist counsel in recognizing the proper application of the good faith and fair dealing concept in a contract action. A distributor had 18 months left on a contract to distribute an old product, paste size, and also a contemplated new product, emulsion size when it was perfected and ready for sale. The manufacturer wrongfully terminated the contract one year early. The emulsion size had not yet been offered for distribution, but evidence showed that it was available and ready and would in all likelihood have been a profitable product. The distributor sued for damages for wrongful termination

---

**3.** As the agent of OM and CP, OP holds the commodities profits in trust for them. *West v.* *Humphrey*, 21 Nev. 80, 25 P. 446 (1890).

and included a separate cause of action for breach of the covenant of good faith and fair dealing because the manufacturer wrongfully failed to make the emulsion size available for distribution. The evidence on all issues was hotly disputed. The trial court instructed the jury that for plaintiff to prevail on breach of the covenant of good faith and fair dealing it must prove: (1) that the manufacturer was able to supply emulsion size to plaintiff for sale to customers, (2) that it refused to supply the product when it was able to do so, (3) that its refusal was for some reason other than a good faith business reason, and (4) plaintiff suffered damages. The jury returned a verdict for plaintiff which was affirmed. The foregoing is only illustrative. It is not a prediction of what instructions may be appropriate in the present case.

There is considerable material in this case which suggests that Occidental might not have entered into the futures trading contracts if the production from the Candelaria Mine had not been available; we do not know what would have happened if the silver market had gone the other way rather than plummeting, but the contracts were spoken of as a "hedge." We do not know what, if any, damages plaintiffs suffered by reason of Occidental's choice, approved by Candelaria's partners, to jettison the futures contracts. We do know that Candelaria Partners exercised an arbitrary power, and it may well be that evidence will support a claim that the parties reasonably expected and anticipated that benefits would accrue to the contracting parties from the futures contracts negotiated by Occidental and that Candelaria Partners approved the discharge of the futures contracts to deprive plaintiffs of royalties to which they would otherwise be entitled and with an "abandoned and malignant heart."

Whether a prima facie case can be proved will have to await the event.

Good cause appearing,

IT HEREBY IS ORDERED that the renewed motion for summary judgment is hereby denied.

## PROCEDURAL ORDER

The parties have comprehensively briefed a motion by defendants to bifurcate the trial so that the issue of liability will be tried separately from the issue of damages. The principle result of their efforts has been to persuade the Court that this action is not ready for trial.

Plaintiffs' Amended Complaint was filed on May 23, 1983. Defendants answered on June 23, 1983. The Second Affirmative Defense of the Answer alleges:

29. That plaintiffs have failed to join as a party hereto Argentum Consolidated MINES, Inc., in whose absence complete relief cannot be accorded among those already parties and whose interest in the subject matter of this action is such that disposition of this action in its absence will leave defendants subject to a substantial risk of incurring multiple or inconsistent obligations by reason of its interest, and that said party cannot be joined herein by reason of the automatic stay issued at the commencement of a proceeding pursuant to Title 11, Chapter 11 of the United States Code, in which proceeding said party is the debtor.

No action has been taken to bring this defense before the Court for resolution. The Court agrees with plaintiffs that if there exists a jurisdictional defect of parties there should be no trial and the action should be dismissed if the deficiency cannot be cured. Defendants' suggestion that we should have a trial on liability and then see what happens on the issue of an absence of an indispensible party is intolerable.

Accordingly,

IT HEREBY IS ORDERED:

1. Defendants have moved to dismiss the action on the basis of the allegations of their Second Affirmative Defense. Defendants' memorandum in support of the motion shall be served and filed within twenty (20) days. Plaintiffs shall have twenty (20) days thereafter to serve and file an answering memorandum and defendants shall have ten (10) days to reply.

2. The pre-trial conference scheduled for November 14, 1985, is vacated.

## ORDER ON MOTION TO JOIN NECESSARY PARTY

This action has been pending since October 1981. It certainly has not been dormant during these four and one-half years but an inordinate amount of time has been consumed by the parties (many stipulations for extensions of time have been approved) and by the Court in the resolution of ponderous interim motions.

■ Before the case came on for final pre-trial conference, the Court observed the existence of the Second Affirmative Defense in defendants' answer and entered a procedural order on October 30, 1985, requiring briefing of the issue of defect of parties. The Court at that time mistakenly viewed the failure to join Argentum Consolidated Mines, Inc. (Argentum) to be an alleged jurisdictional defect. It is now apparent that joinder is sought under Rule 19(a) Fed.R.Civ.P. and the alleged defect of parties is not jurisdictional. Following the guidelines of Rule 19(a), the Court finds that in the absence of Argentum complete relief can be accorded among those already parties, and failure to join Argentum will not impede or impair its ability to protect its interests and will not leave defendants subject to a substantial risk of incurring inconsistent obligations.

Argentum is the plaintiff in an action against defendants (Candelaria Partners and Occidental Minerals) in the Central District of California (*Argentum Consolidated Mines, Inc. v. Occidental Minerals Corp., et al.*, No. 80–05417–CA). The complaint was filed on December 30, 1981. Argentum, like Candelaria Industries, seeks a proportionate share of the profits from the closed out futures contracts.

The only problem demonstrated by the record relates to the computation of damages. The Candelaria Mine being developed and exploited by defendant Candelaria Partners consists of a number of patented and unpatented mining claims, obtained in part by agreements with plaintiffs, and in part by agreements with Argentum. The agreements have substantial differences and to date, at least, it has not been shown that the California court in the Argentum case believes that the Argentum agreements should be interpreted and applied in the same way that the court has found appropriate for plaintiffs' agreements. Defendants contend that it is impossible to try the two cases separately because of the confusion of the properties from which the minerals were or would be mined and because of the necessity, for defendants' protection, that the same formula be applied to determine what, if any, recoverable damages plaintiffs have suffered and what, if any, recoverable damages Argentum has suffered.

Upon reflection we have concluded that these arguments do not have sufficient strength to justify attempted joinder of Argentum. Plaintiffs have appropriately called the Court's attention to the terms of the purchase agreement with defendants' predecessor, Congdon. Both Section 4A and Section 4A(b) of the agreement expressly refer to the properties and interests of Argentum Consolidated Mines, Inc. and by necessary implication declare the necessity of conducting operations in a way which will permit the separation and separate accounting for production from the differently owned properties. Defendants' protestations that this cannot be accomplished from a practical point of view come too late.

Further, there exist somewhat imponderable problems inhering in an attempt to join Argentum. The Bankruptcy Court handling the Argentum Chapter 11 proceeding has attempted to retain control and continue in effect the original automatic stay of other actions against Argentum. While this effort is questionable, it is also true that an order seeking to join Argentum would have to require joinder as an involuntary plaintiff in order not to destroy diversity. Such a procedure presages more trouble. All in all there is, in this case, no compelling reason why an effort should be made to join Argentum and many sound reasons why such complications should be avoided.

■ Defendants also have moved for a bifurcated trial separating liability from damages. The Court appreciates that in

some cases such a separation is helpful. Having reviewed the briefs, however, we think that in this case the proof of damages is inextricably intermingled with the proof of liability. What the parties in fact did, and were prepared to do, and the reasons for their conduct, have so much bearing upon the issue of liability that there is little benefit, and some considerable logistical problems, which may ensue from the separation of the liability and damages phase of the trial.

At the last conference with counsel the Court mused about the possibility of directing a Rule 54(b) entry of judgment on its earlier order granting summary judgment on two of plaintiffs' claims and the possibility of seeking discretionary appellate review under 28 U.S.C. 1292(b) of other controlling questions of law. The parties have discussed these possibilities and have assisted the Court in reaching a decision. After reviewing its earlier orders the Court has concluded that they are not so doubtful or lacking in merit as to warrant the delays indigenous to intermediate appellate review and an appellate court will have a much more substantial foundation of fact to base its review of the case after a trial on the merits.

It is time to get the show on the road.

Accordingly,

IT HEREBY IS ORDERED:

1. The motion to dismiss or to join Argentum Consolidated Mines, Inc. as a necessary party is denied.

2. The motion for a bifurcated trial is denied.

3. A final pre-trial conference will be held at 1:30 p.m. on the 25th day of July, 1986.

### COURT'S STATEMENT OF SUBSEQUENT PROCEEDINGS

In this action a pre-trial order was entered on April 8, 1987 and the case was set for jury trial to commence on May 5th. The trial consumed eight days. The issues of both liability and damages were hotly disputed.

The following basic instruction was given by the court without objection:

In every contract there is an implied covenant of good faith and fair dealing. In every contract there may be promises and conditions to be performed by each party. The implied covenant of good faith and fair dealing requires that neither party will without justification do anything that will injure the rights of the other to receive the benefits of the agreement. This action is concerned with only one aspect of the contract, exhibit 1, namely, the alleged marketing of the product of the mine. For plaintiffs to prevail they must prove by a preponderance of the evidence:

1. That the commodity futures contracts were entered into by Occidental Petroleum Corporation as agent of and for the benefit of Oxymin and Candelaria Partners and not for its own account.

2. That the decision to terminate the futures contracts was made with the purpose and motive of depriving plaintiffs, who had a financial interest in the production of the Candelaria properties, from receiving any benefit from such contracts.

3. That defendants had no other independent good faith business reason for terminating the contracts.

4. That the termination of the futures trading contracts in March 1980 caused damage to plaintiffs.

5. The amount of plaintiffs' damages.

On the issue of damages, one of the problems arose from the fact that although commencing in November 1980 Candelaria Partners did actually produce sufficient silver and gold to supply the commodity futures trading contracts the production would only have satisfied in part the requirements of the contracts at the times delivery was specified. Plaintiffs contended through expert witnesses that the contracts could easily have been "rolled forward" and also that several measures could have been employed to accelerate production if it had been necessary. Defendants countered with evidence that they had no obligation to plaintiffs to make any adjust-

ment in the contracts and that the tempo of production from the property was all that could reasonably have been expected.

After three hours and forty-five minutes of deliberation the jurors returned a verdict for plaintiffs for $1,666,883.00. This is the exact amount computed by defendants' expert mineral economist in one of the several schedules prepared by him. The damages, including prejudgment interest at 12%, were calculated from "contracts positioned at March 11, 1980 that could have been satisfied by actual production." Thus it is apparent that the jurors found for plaintiffs on the issue of liability and against plaintiffs on the issues of an obligation to roll the contracts forward to coincide with actual production and the alleged reasonableness of more efficient mining practices.

Subsequently, the parties settled this action and the court, on stipulation, ordered that the judgment entered on the jury verdict be vacated and that the action be dismissed with prejudice.