NADA NOVAKOVICH ALUEVICH, Appellant, v. HARRAH'S, a Nevada Corporation; HARRAH'S CLUB, a Nevada Corporation; HOLIDAY INNS, INC., a Tennessee Corporation; L. MEAD DIXON; LLOYD DYER; ROMANO ANDREOTTI; MAURICE SHEPPARD; BOB CONTOIS; and GEORGE POORE, Respondents.

No. 13533

March 31, 1983                                    660 P.2d 986

[Rehearing denied July 29, 1983]

*Nicholas J. Drakulich* and *Nada Novakovich,* Reno, for Appellant.

*Vargas & Bartlett,* Reno, for Respondents.

## OPINION

By the Court, MANOUKIAN, C. J.:

This appeal concerns the scope of an implied covenant of good faith and fair dealing. Finding that courts have not extended such a covenant to commercial leases between two sophisticated parties who are not otherwise bound by any special element of reliance or fiduciary duties, we affirm the directed verdict dismissing appellant's claim for tortious breach of an implied duty of good faith and fair dealing.

Appellant is a Reno attorney who, from 1968 to 1978, operated Luke's Gift Shoppe and Luke's Nevada Photo Service at the northwest corner of Second and Virginia Streets on the ground floor of the Byington Building. Appellant occupied that building under a succession of subleases from Harrah's Club. Since 1968, all of the subleases between appellant and Harrah's Club have contained a provision which granted Harrah's Club "the option to cancel this lease upon ninety (90) day's written notice to [appellant]." Appellant now claims that throughout

all lease negotiations, the respondents orally assured her that the ninety day termination privilege would not be exercised unless she operated unrestricted or unlimited gaming in the gift shop or the shop became cluttered with too much merchandise. None of those restrictions, however, appeared in any of the written lease agreements; the termination privilege contained in all of the subleases was absolutely unqualified.

On October 2, 1978, pursuant to the termination privilege contained in the 1978 sublease, Harrah's served notice on appellant of its intention to cancel the sublease. The effective date of cancellation was January 1, 1979, but Harrah's granted an extension until February 29, 1979. Appellant vacated the premises on that date. Following the cancellation, appellant filed a complaint which alleged numerous claims for relief. Because all other claims are meritless, we shall address only appellant's contentions regarding the tort action for breach of an implied duty of good faith and fair dealing.

The court below held that no genuine issue as to any material fact existed regarding the "bad faith" claim and granted a directed verdict, pursuant to NRCP 50(a), in respondents' favor. Appellant argues that the lower court's ruling was erroneous, in that, evidence was presented which showed that respondents terminated the 1978 sublease to usurp a profitable business that she had operated on the demised premises for several years.

In U.S. Fidelity v. Peterson, 91 Nev. 617, 540 P.2d 1070 (1975), this court recognized a cause of action in tort for the breach of an implied covenant of good faith and fair dealing where an insurer fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy. *Id.* at 620, 540 P.2d at 1071. Appellant requests this court extend such a cause of action to her case. The tort recognized in *Peterson,* however, arose out of a need for special protection of insureds in light of the quasi-public nature of the insurance industry and the element of an insured's heavy reliance upon the insurer's credibility. *See* Comment, *The New Tort of Bad Faith Breach of Contract: Christian v. American Home Assurance Corp.,* 13 Tulsa L. J. 605, 613-616 (1977-78). The dissent correctly notes that an implied covenant of good faith and fair dealing has mainly been implied in contractual relations which involve a special element of reliance such as that found in partnership, insurance and franchise agreements. The case relied on by the dissent concerned a situation where one party has traditionally held vastly superior bargaining power—the termination of a

salesperson's "at will" employment contract. Fortune v. National Cash Register Co., 364 N.E.2d 1251, 1253 (Mass. 1977).

In the present case, the appellant is an experienced business-person and an attorney. The unqualified termination privilege was the subject of negotiations for ten years. Although the cancellation privilege remained unqualified, appellant continued to renew the subleases. The relationship between appellant and respondent was that of lessee and lessor. We do not find, in the present case, the special element of reliance which prompted this court in *Peterson* to recognize a cause of action in tort for the breach of an implied covenant of good faith and fair dealing.

We have considered the remaining assignments of error and find them to be without merit. Therefore, the lower court's involuntary dismissal and directed verdict and the jury's verdict in respondents' favor are affirmed.

MOWBRAY and STEFFEN, JJ., and ZENOFF, SR. J.,[1] concur.

SPRINGER, J., dissenting:

There is evidence in this record that respondents, Harrah's, Harrah's Club and Holiday Inns, Inc. did not act in good faith in performance and enforcement of the March 1, 1978, lease agreement. I would remand this case to the trial court for jury consideration of appellant's claim for breach of implied covenant of good faith and fair dealing.

Because we are reviewing a verdict granted pursuant to NRCP 50(a), we must view the evidence and all inferences in the light most favorable to the party against whom the motion was made. Connell v. Carl's Air Conditioning, 97 Nev. 436, 438, 634 P.2d 673 (1981); Drummond v. Mid West Growers, 91 Nev. 698, 542 P.2d 198 (1975).

Since 1968, Aluevich operated a gift shop and photography business under a succession of subleases from Harrah's. All of the leases before 1978 provided for a flat monthly rental fee to be paid by Aluevich. On June 30, 1977, Aluevich notified Harrah's of her intention to renew the 1973 lease. During lease renewal negotiations Harrah's disclosed that it was considering establishing its own gift shop business on the premises and requested sales data from Aluevich. Aluevich refused to provide this information. Aluevich introduced at trial a Harrah's memorandum, circulated before the execution of the 1978 renewal, in which mention was made of a recommendation to

---

[1]THE HONORABLE DAVID ZENOFF, Senior Justice, was assigned to participate in this case by the Chief Justice, pursuant to Nev. Const., art. 6, § 19.

"take over this operation when the lease expires in February, 1978." Another pre-lease memorandum in the record refers to the "profit potential from operating Luke's Gift Shoppe as a Harrah's entity."

Aluevich claims that to obtain the gross and the net sales figures of her business, Harrah's proposed the negotiation of a percentage lease in which these figures would necessarily have to be disclosed. Aluevich accepted this proposal. The lease as renewed provided for rental on a percentage basis and for disclosure of profit figures. It also contained a provision which permitted Harrah's to terminate the lease on 90 days' notice to Aluevich. According to Aluevich, however, agents of Harrah's told her that the termination right would be exercised only if Aluevich were to put gaming into the lease premises or if the premises were allowed to become cluttered or unkempt.

After the renewal in March of 1978, Harrah's continued to move toward takeover by making projections of anticipated profits from a proposed Harrah's operation in the subject area. Harrah's admitted it had, prior to termination, projected an annual pre-tax profit of $800,000 by operation of a business similar to that of Aluevich. Harrah's also admitted that Aluevich's lease was terminated because Harrah's earnings and projected earnings were falling. Lloyd Dyer, president of Harrah's in 1978, testified that Aluevich was a good tenant and ran a good store.

Seven months after execution of the lease and after Aluevich had disclosed the closely guarded profit and income figures, Harrah's gave termination notice under the 90-day clause. Respondents have not alleged that Aluevich defaulted on any of the provisions of the lease. Aluevich vacated pursuant to the notice and Harrah's proceeded, as it had previously indicated, to conduct a retail business in the subject premises.

In sum, Aluevich's position is that a jury could have reasonably inferred that Harrah's did not deal fairly with Aluevich in that it had no intention of allowing Aluevich to remain on the premises for the duration of the lease term but rather that its intention was to obtain Aluevich's business figures and then take over the business at an early and convenient date.

Harrah's position is not that Aluevich has failed to present a case which would, if believed, form the basis for a bad faith action against Harrah's. Rather, Harrah's argues that an action for breach of an implied duty of good faith and fair dealing will lie only with relation to insurance and franchise contracts. Also, Harrah's contends that the parol evidence rule prohibits consideration of any oral representations regarding termination to Aluevich's lease which contradict the clear meaning of the unqualified termination clause.

Although many of the cases which recognize an implied covenant of good faith and fair dealing involve insurance and franchise contracts, I see no reason to restrict actions arising therefrom to these kinds of contracts. In U.S. Fidelity v. Peterson, 91 Nev. 617, 540 P.2d 1070 (1975), this court imposed a duty on insurers to deal fairly and in good faith with their insureds. That duty arose from the premise that an implied covenant of good faith and fair dealing exists in *every* contract, that neither party should be permitted to do anything which will injure the right of the other to receive the benefits of the agreement. *See* Silberg v. California Life Insurance Co., 521 P.2d 1103, 1108 (Cal. 1974); Gruenberg v. Aetna Ins. Co., 510 P.2d 1032, 1036 (Cal. 1975); Comunale v. Traders & Gen. Ins. Co., 328 P.2d 198, 200 (Cal. 1958). In Mitchell v. Bailey & Selover, 96 Nev. 147, 605 P.2d 1138 (1980), this court applied the obligation of good faith and fair dealing contained in the U.C.C., *see* NRS 104.1203, to the enforcement of a warehouseman's lien. Under these rulings it is indeed difficult to maintain such a restricted approach to bad faith actions as is taken by the majority. *See* Restatement (Second) of Contracts § 205 (1981).

A leading example of recognition of this type of action may be found in Fortune v. National Cash Register Company, 364 N.E.2d 1251 (Mass. 1977), in which it was held that although a salesman's employment contract was terminable at will, there was still an independent action for breach of the implied obligation of good faith where the salesman was found to have been discharged in order to avoid payment of a bonus. In *Fortune* the salesman's employment was terminated shortly after his company received a $5,000,000 order from his territory. The jury found that the defendant acted in bad faith when it terminated the salesman's employment and awarded damages. The Supreme Judicial Court of Massachusetts upheld the jury verdict, recognizing the general right of an employer to terminate "at will" but also recognizing an independent breach of contract action because the "parties to contracts and commercial transaction must act in good faith toward each other." This holding is buttressed by Professor Summer's observation that when parties agree to an "at will" termination power, they usually agree merely to the grant of a power and not also to the grant of a power to abuse that power. R. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 Va.L.Rev. 195, 197-98 (1968).

In deciding this case it is not necessary to pronounce any

general rules as to when and under what contractual circumstances an action for breach of the duty of good faith and fair dealing would lie. In contract law, good faith is an "excluder." "It is a phrase without general meaning of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on a specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out." *Id.* at 201. "Good faith, then, takes on specific and variant meanings by way of contrast with the specific and variant forms of bad faith which, [based on the law's standard of fairness which all people ought to observe in their dealings with each other], judges decide to prohibit." *Id.* at 202-04. I would hold only that in this case a jury would be justified, if it accepted the position of Aluevich, in finding that there was an obligation of good faith and fair dealing imposed on Harrah's in the performance and enforcement of the subject lease contract, that Harrah's breached that obligation, and that Harrah's was responsible for damages resulting form such breach. *Cf. Fortune,* 364 N.E.2d at 1257.

With regard to Harrah's contention that parol evidence cannot be used to contradict the clear terms of the termination clause, I would simply say that the evidence outlined above is offered for the purpose of supporting an independent action for violation of the implied covenant or obligation of good faith. Such evidence does not serve to cancel or alter the termination privilege. Assuming an unqualified right on the part of Harrah's to terminate the lease, the question remains as to whether the conduct complained of, if believed by a jury, would support an action for damages against Harrah's for violation of the implied covenant of good faith and fair dealing. I believe it does and would reverse on this issue and remand for trial.