K MART CORPORATION, a MICHIGAN CORPORATION, APPELLANT, v. GEORGE J. PONSOCK AND BARBARA PONSOCK, RESPONDENTS.

No. 16736

February 24, 1987                                      732 P.2d 1364

---

*McDonald, Carano, Wilson, Bergin, Frankovich & Hicks,* Reno, for Appellant.

*Woodburn, Wedge, Blakey & Jeppson,* and *Chris Wicker,* Reno, for Respondents.

*Marquis & Haney,* Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

# OPINION

By the Court, SPRINGER, J.:

Ponsock was a tenured employee of K Mart. Evidence supports a jury finding that K Mart dismissed Ponsock in order to save having to pay him retirement benefits provided for in the employment contract. The question is whether such conduct is tortious. We find that it is and approve a jury award for compensatory and punitive damages for the tort of breach of the covenant of good faith and fair dealing.

## *Ponsock's Status as Tenured Employee*

Although for some inexplicable reason K Mart insists on referring to the employer-employee relationship with Ponsock as being "at-will,"[1] it is not. In contrast to our case of Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), wherein we held that a factfinder could find from the evidence that an employee handbook was part of an employment contract, here we have K Mart stipulating that the written provisions of its employee handbook are part of the contract of the parties. Ponsock is a tenured employee; K Mart hired him "until retirement" and for "as long as economically possible." K Mart agreed in its contract with Ponsock that if there were any deficiencies in Ponsock's performance, the company would provide "assistance" and would "release" Ponsock only after giving him a series of "correction notices." Ponsock could be released only on a determination that his performance "remain[ed] unacceptable."

K Mart breached its contract; it released Ponsock without notifying him of any employment deficiencies, failed to give assistance to him as promised, and certainly, therefore, could not possibly have based Ponsock's dismissal on a conclusion that the employee's conduct had *remained* unacceptable.

---

[1] An "at-will" employee is one that can be properly discharged without cause at the will of the employer. Ponsock most certainly is not an at-will employee; rather, by stipulation of K Mart, Ponsock could not be discharged unless the conditions set forth in the employee handbook were followed. In Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), a tacit agreement was implied in fact from the conduct of the parties; here there was an express contract in both oral and written form. At the time Ponsock was hired, K Mart agents represented to him that he would remain on the job until he retired as long as he did his job satisfactorily. This understanding was incorporated in the written handbook which is stipulated by K Mart to be the contract of the parties. Such an arrangement cannot possibly be characterized as being "at-will."

## Facts Surrounding Discharge

In stating these facts we must assume that the jury believed all the evidence favorable to the prevailing party, Ponsock, and give Ponsock the benefit of inferences that might reasonably be drawn from such evidence. Paullin v. Sutton, 102 Nev. 421, 724 P.2d 749 (1986); Novack v. Hoppin, 77 Nev. 33, 359 P.2d 390 (1961).

In 1972 Ponsock, 43 years of age, was hired as a forklift driver at K Mart's Distribution Center in Sparks, Nevada. Ponsock left his former job as a coin counter at a casino in order to take advantage of the increased job security and enhanced benefits offered by K Mart. The starting wages at K Mart were virtually the same as those he had been making at the casino ($3.75 per hour). At K Mart Ponsock was categorized as an excellent employee by his immediate supervisor and was considered to be a good employee by the higher management at the distribution center. After nine and one half years at K Mart, Ponsock was earning $9.40 per hour and was approximately six months away from 100 percent vesting of his retirement benefits, which are paid in full by K Mart.

On March 30, 1982, Ponsock was fired for applying gray primer spray paint to the battery cover of the forklift which he operated. Ponsock testified that on this day he noticed that an area on the battery cover where he placed his hand while backing the forklift had become "sticky and gunky." After an unsuccessful attempt to have the maintenance department clean the forklift, and after Ponsock had unsuccessfully attempted to clean the cover himself, he decided to spray gray primer paint on the battery cover to correct the condition.

Earlier in the day, Ponsock had found a damaged can of gray primer spray paint, retail value eighty-nine cents, and had taken it to the salvage area. The forklift drivers are authorized to remove damaged merchandise to the salvage area; but, according to company rules, any employee wanting to retrieve damaged goods from salvage must gain approval from management. After unsuccessful attempts at cleaning the sticky area, Ponsock returned to the salvage area, retrieved the damaged can of paint and sprayed the battery cover. This was done without Ponsock's having secured permission to do so.

When a Mr. Williamson of the maintenance department saw that Ponsock had painted the battery cover, he told Ponsock to clean it off. Ponsock complied. While in the process of cleaning off the primer the operations manager at the center, mentioned to Ponsock that he should not have done what he did. After the center manager, the personnel manager and the operations manager conferred about the matter, they decided to terminate Pon-

sock. Ponsock was then called to the personnel office, whereupon the personnel manager presented him with his final paycheck and told him he was fired. Ponsock was stunned by this statement, and was puzzled as to why he was being terminated. When the personnel manager mentioned the painting incident, Ponsock attempted to defend his actions; but he was given no opportunity to explain the incident. In the days that followed, Ponsock attempted to see the higher management at the center, but the security guard refused to allow Ponsock on the property.

The company's separation report listed as the reason for termination: "defacing company property, forklift, with misappropriated merchandise, paint, on company time." When the State Department of Unemployment inquired of K Mart management regarding the reason for Ponsock's termination, K Mart, in referring to Ponsock's retrieval and use of the spray paint, characterized Ponsock as a thief.

At trial K Mart claimed that its decision to fire Ponsock was based, to a large extent, on a prior painting incident involving Ponsock. Regarding the claimed prior painting incident, the evidence is in sharp conflict. Ponsock testified that during the time he was assigned to a painting detail, some red paint spilled on his forklift and that while he was attempting to wipe it off, the operations manager had merely commented: "Make sure you clean it up before you leave." Other witnesses for K Mart testified that the paint was green and appeared to have been purposely brushed on the forklift rather than spilled and claimed that Ponsock was warned by the operations manager that he would be fired if caught painting the forklift again. Ponsock flatly denied these allegations, and Ponsock's immediate supervisor, a Mr. Britt, testified that he knew nothing of a prior painting incident even though Ponsock had been under his supervision at the time of the alleged incident. None of K Mart's witnesses could state that they actually observed Ponsock paint the forklift. Much contradictory testimony appears in the record concerning this incident.

Testimony revealed that approximately ten percent of the forklifts at the distribution center have unauthorized paint on them and that no other employee has ever been fired, either before or after Ponsock, for applying paint to the vehicles without permission. Also, importantly, during a tour of the distribution center by Ponsock and his counsel, K Mart attempted to hide a forklift that had unauthorized green paint applied to it in a fashion similar to the manner in which K Mart alleges that Ponsock had done in the first painting incident in January of 1982. One of K Mart's maintenance employees admitted that he placed the forklift in the out-of-the-way place in order to hide it from Ponsock's lawyers.

After being fired, Ponsock went through a long period of unemployment. Ponsock was unable to obtain any employment comparable to his position at K Mart. After several short term or part time jobs, he finally gained full time employment in a manual labor position at $4.20 per hour with no benefits. After Ponsock lost his job, the family house went into foreclosure only to be saved from the foreclosure sale by his nephew who purchased the home for $11,000 less than the claimed market value.

## Contract Liability

Under the stated circumstances it cannot be honestly argued that Ponsock was an at-will employee. He had definite rights of employment tenure and was contractually entitled to be retained until dismissal for cause was properly carried out in the manner provided for in the employment contract. The employment contract was violated by K Mart, and Ponsock is entitled to damages for breach of contract.

An economist was called to testify as to the damages resulting from the breach. The sum of $382,120.00 was offered as the expert's opinion on the amount of damages suffered by Ponsock. The award of $382,120.00 as compensatory damages for breach of contract is supported by substantial evidence and will be affirmed.

A total of $393,120.00 in compensatory damages was awarded by the jury. The difference between this amount and the above-mentioned $382,120.00 in contract damages is $11,000.00, an amount awarded as a result of a claimed $11,000.00 lost by Ponsock when he was forced to sell his home after being fired.

It cannot be seriously argued that this $11,000.00 is properly claimable as contract damages. *See* Las Vegas Oriental, Inc. v. Sebella's of Nev., Inc., 97 Nev. 311, 630 P.2d 255 (1981); Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854). The $11,000.00 award can be affirmed only if tort liability was correctly determined by the jury to exist in this case. Indeed, the only jury instruction allowing for an award based on the loss of Ponsock's home required a jury finding that K Mart tortiously failed to act in good faith; so we now pass to a consideration of whether or not K Mart may be subject to tort liability under the circumstances of this case.

## Tort Liability

Mr. Blackstone tells us: "[C]ourts of justice are instituted in every society in order to protect the weak from the insults of the

stronger by expounding and enforcing those laws by which rights are defined and wrongs punished."[2] The impression on reading this record is that K Mart's actions[3] can be described in terms of "insults of the stronger" and appear to be inherently wrong and abusive. One gets the impression that a Rawlsian[4] observer looking at this kind of conduct would have to conclude that if such actions were not actionably tortious, they should be.

A tort, as generally defined, is a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages. Black's Law Dictionary, Fifth Edition, 1335 (1979). This court has already recognized the presence of tort liability in non-contractual[5] employment situations "founded upon strong public policy." *Hansen v. Harrah's,* 100 Nev. 60, 675 P.2d 394 (1984). In *Hansen* this court recognized a "tortious discharge" or "public policy"[6] tort for retaliatory discharge of an employee dismissed for filing a workmen's compensation claim. Although this kind of a public policy tort cannot ordinarily be committed absent the employer-employee relationship, the tort, the wrong itself, is not dependent upon or directly related to a contract of continued employment such as that existing in the present case.

---

[2]*Commentaries on the Laws of England,* Vol. II, Bk. III, p. 2; Lippencott & Co., 1860.

[3]We note that K Mart's actions in breaching its obligation of continued employment is not the gravamen of the tort action in this case. The mere discharge of a tenured employee in violation of the employment contract does not constitute tortious conduct. Here, as seen from the fact statement, we have a course of action on the part of K Mart which the jury expressly found to be malicious and oppressive and from which the jury could very reasonably have concluded that K Mart dismissed Ponsock for the very unworthy motive of evading its duty to pay his retirement benefits. This is much more than a mere breach of contract and, as is discussed below, rises to the level of what is termed a bad faith tort.

[4]John Rawls, a contemporary jurisprudent, in *A Theory of Justice* (1972), attempts to establish an objective theory of justice. Rawls postulates a hypothetical situation in which one does not know his place in society or his own fortune and thus formulates principles of justice and fairness from behind a "veil of ignorance." Under such conditions no one would be able to favor his own particular condition and would, accordingly, make disinterested and rational choices. Such an observer would most likely see the justice in affording compensation for the wrong, the tort, suffered by Ponsock at the hands of K Mart.

[5]By "non-contractual" is meant the absence of any contractual obligation of continued employment, the so-called at-will employment contract.

[6]A worthwhile distinction among the various kinds of actions arising out of employment situations is found in the California case of Koehrer v. Sup. Ct., 181 Cal.App. 1155, 1163, 226 Cal.Rptr. 820, 824 (1986), in which we find this useful language:

The public policy torts in general and the tort of retaliatory discharge in particular cannot be seen as erosions of the so-called at-will doctrine. An employer still has in the typical at-will employment situation the absolute right to dismiss an employee at-will or at-whim; the employer just cannot do so for reasons which offend public policy, such as the rightful filing of an industrial insurance claim. Such dismissals are contrary to the established public policy of this state, *Hansen,* 100 Nev. at 64, 675 P.2d at 397, and constitute tortious conduct in this state.

## Bad Faith Discharge

The case before us is distinguishable from the public policy tort of *Hansen* and can be labeled in accordance with the *Koehrer* case, cited in the margin, as a "bad faith discharge." K Mart, in light of the evidence most favorable to Ponsock, must be judged to have fired Ponsock to get rid of his retirement claims. This is a bad faith discharge giving rise to tort liability.[7]

It would be conducive to proper analysis if courts and lawyers used a different nomenclature to denominate these different situations in which liability is imposed after all on different legal theories. Appropriate nomenclature might be "breach of employment contract," for the true breach of contract case, "tortious discharge," for public policy cases, and "bad faith discharge," for the cases involving breach of the implied covenant of good faith and fair dealing.

[7]Even without the jury's express finding of bad faith on the part of K Mart, K Mart's bad faith is manifest. Even though none of the contractual conditions for proper dismissal was followed by K Mart, it still insists that Ponsock was properly dismissed for violating company policy on forklift paintings.

Regarding the two incidents of unauthorized forklift painting, it is notable that in the first alleged incident Ponsock's version differed radically from management's version. The jury could have sensibly believed Ponsock's version since his immediate supervisor knew nothing of the incident. No K Mart witness testified that Ponsock intentionally painted the forklift, nor did K Mart, at the time, document the incident as required by the contractual procedure for disciplining serious incidents of employee misconduct. From the stark conflict in the testimony coupled with the inconsistencies in K Mart's version of this supposed infraction by Ponsock, it would have been quite reasonable for the jury to infer that Ponsock's version was correct: that the paint was accidentally spilled, that he was never reprimanded for the incident, and that there must be some other reason for the dismissal than the excuse offered by K Mart.

K Mart's actions surrounding the painting of the battery cover are similarly suspect. Ponsock was given no opportunity to explain the incident, even though he was completely cooperative in cleaning off the primer paint. When Ponsock tried to confer with management to explain the incident, he was repelled by the guard at the gate. Again, K Mart failed to follow the promised disciplinary procedure outlined in the employee handbook.

The fact that K Mart attempted to hide a forklift with unauthorized paint on it undermines the credibility of its witnesses. Although K Mart's reason

As we have recognized, in the absence of statutory declaration, a public policy tort for retaliatory discharge in an industrial compensation case, we now recognize a bad faith discharge case in this fact-specific instance of discharge by a large, nationwide employer of an employee in bad faith for the improper motive of defeating contractual retirement benefits.

Had K Mart merely breached its contract by firing Ponsock, as it did, arbitrarily and without providing him with the agreed upon protections of assistance, correction notices and a finding of continued unacceptable performance, then Ponsock would have a remedy, but only a contractual remedy. The holding of this case certainly does not imply that mere breach of an employment contract by a large and powerful employer, or any employer, gives rise to tort damages. Such is not the intention of this ruling. Tort remedies are allowed here only because K Mart's conduct goes well beyond the bounds of ordinary liability for breach of contract.

The bad faith discharge case finds its origins in the so-called covenant of good faith and fair dealing implied in law in every contract.[8] The fact that such a covenant exists by legislative fiat

for hiding the forklift is unclear, the avowed purpose was to "hide the forklift from the lawyers." The obvious and reasonable inference from the incident is that K Mart had serious doubts about the propriety of Ponsock's firing and felt that the company needed artificially to shore up its justifications for the termination.

Finally, although approximately ten percent of the forklifts at K Mart had unauthorized paint on them, no other persons had been terminated either before or after Ponsock for applying paint to their forklifts. This, coupled with the suspect circumstances surrounding Ponsock's painting incidents, would naturally lead a jury to the conclusion that K Mart decided to get rid of Ponsock for a particular, undisclosed reason but, instead of saying so, justified his dismissal on its apparently contrived indignation relative to the painting incidents.

K Mart's explanation of the reasons for firing Ponsock does not hold together very well. Ponsock was only six months away from retirement. That K Mart fired Ponsock, an admittedly excellent, long-term employee, over the trivial paint episode may very well have been rejected by the jury. K Mart's characterization of Ponsock as a thief also was likely to have done very little to the company's credit in this lawsuit. All in all, it is likely, rather than merely possible, that the jury saw K Mart's true motive as being to divest Ponsock of his retirement rights.

[8]NRS 104.1203 provides that an obligation of good faith and fair dealing applies to the entire Commercial Code embodied in NRS Chapter 104:

104.1203. Obligation of good faith.
Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.

Section 205 of the Restatement (Second) of Contracts, provides:

§ 205. Duty of Good Faith and Fair Dealing.
Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

most certainly does not mean that out of every contract can emanate a tort action. Still, oftentimes (*see,* e.g., Summa v. Greenspun, 98 Nev. 528, 655 P.2d 513 (1982)) tortious conduct arises out of or is related to a contractual relationship. A tort, however, requires the presence of a duty created by law, not merely a duty created by contract; and, although a duty of good faith and fair dealing is created by law in all cases, it is only in rare and exceptional cases that the duty is of such a nature as to give rise to tort liability. The kind of breach of duty that brings into play the bad faith tort arises only when there are special relationships between the tort-victim and the tort-feasor as described below.

This court has recognized the bad faith tort in cases in which the relationship of the parties is that of insurer and insured. United States Fidelity v. Peterson, 91 Nev. 617, 540 P.2d 1070 (1975). As the tort in the present case arose out of an employment contract of continued tenure with a large corporate employer, the tort in the *Peterson* case arose out of an insurance contract. As put in Aluevich v. Harrah's, 99 Nev. 215, 660 P.2d 986 (1983), this court "recognized a cause of action in tort for the breach of an implied covenant of good faith and fair dealing where an insurer fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate for a loss covered by the policy." The tort, we say in *Aluevich*, 99 Nev. at 217, 660 P.2d at 987, arises "out of a need for a special protection of insured in light of the quasi-public nature of the insurance industry and the element of an insured's heavy reliance upon the insurer's credibility." The court in *Aluevich* also recognized that the implied good faith covenant involves a "special element of reliance" by the aggrieved party, the type of reliance that is found, for example, in the relationship engendered by insurance, partnership and franchise agreements.

One of the underlying rationales for extending tort liability in the described kinds of cases is that ordinary contract damages do not adequately compensate the victim because they do not require the party in the superior or entrusted position, such as the insurer, the partner, or the franchiser, to account adequately for grievous and perfidious misconduct; and contract damages do not make the aggrieved, weaker, "trusting" party "whole."

If we are to be consistent in trying to "protect the weak from the insults of the stronger" (Blackstone, above), we should in the present case be asking ourselves these questions:

1. Is there, as in the insurance cases, such a superior-inferior power differential as to create a "special element of reliance" resulting from the employee's reliance on the employer's credi-

bility and the employer's promise and powerfully expectant guarantee of retirement benefits?

2. Would contract damages hold employers like K Mart accountable for this kind of misconduct?

3. Would contract damages, under circumstances such as these, make an aggrieved employee "whole"?

"In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion and fiduciary responsibility. . . . No doubt there are other relationships with similar characteristics and deserving of similar legal treatment." Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 686 P.2d 1158, 1166 (Cal. 1984). Such an "other relationship" (other than the insurer-insured relationship) has already been recognized by this court. In Mitchell v. Baily & Selover Inc., 96 Nev. 147, 605 P.2d 1138 (1980), this court held that the good faith obligation of the Uniform Commercial Code, NRS 104.1203, applies to the enforcement of a warehouseman's lien pursuant to NRS 104.7209-104.7210. In *Mitchell* a customer had signed a written storage contract with a warehouse company. The warehouse gave notice to the customer that on nonpayment of storage fees the stored goods were to be sold. The customer then advised that she intended to redeem her goods on the anticipated receipt of an ample sum of money from a Social Security settlement. She asked that the foreclosure sale be postponed for this reason; but the warehouse, deeming itself "insecure," refused and sold the property. In a unanimous opinion, this court held that summary judgment in favor of the warehouse must be reversed because "a determination by [the warehouse] that it was insecure with regard to [the customer's] debt is a determination that must be made in good faith," and that the question of good faith is a question of fact that must be decided by the fact finder. In the case at hand we already have an express jury finding that K Mart did not act in good faith.

We refused to allow a bad faith tort action in the case of *Aluevich v. Harrah's,* above. *Aluevich* involved the cancellation of a lease in accordance with the termination provisions of the lease. The court pointed out in *Aluevich* that the relationship of the parties was merely that of lessor and lessee, that the unqualified termination privilege in the lease had been the subject of ten years' negotiation and that the plaintiff was an experienced business person and attorney. Under such circumstances this court did not find "the special element of reliance which prompted this court in *Peterson* to recognize a cause of action in tort. . . ." *Aluevich,* 99 Nev. at 218, 660 P.2d at 987.

Although careful analysis in *Mitchell* is lacking, we are still mindful of our having recognized a bad faith tort arising out of the bailment relationship there existing. Much more worthy of tort recovery, it would seem, is the claim asserted by Ponsock in the case before us.

The reality of Ponsock's dependency and economic vulnerability is highlighted by the following expression taken from F. Tannenbaum, *A Philosophy of Labor 9* (1951):

> We have become a nation of employees. We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for *all* of their income is something new in the world. *For our generation, the substance of life is in another man's hands.*

(Emphasis added.)

In this case we have a contract in which the relationship of the parties is in many ways analogous to those present in an insurance contract. Ponsock was just as dependent in "specially relying" on K Mart's commitment to his extended employment and subsequent retirement benefits as is an insurance policy holder dependent on the good faith indemnity promised by the insurance carrier. The special relationships of trust between *this* employer and *this* employee under *this* contract under *this* kind of abusive and arbitrary dismissal cries out for relief and for a remedy beyond that traditionally flowing from breach of contract. To permit only contract damages as the sole remedy for this kind of conduct would be to render K Mart totally unaccountable for these kinds of actions. If all a large corporate employer had to do was to pay contract damages for this kind of conduct, it would allow and even encourage dismissals of employees on the eve of retirement with virtual impunity. Having to pay only contract damages would offer little or no deterrent to the type of practice apparently engaged in by K Mart in this case. Further, an aggrieved employee, relying on, and anxiously awaiting his retirement benefits would not be made whole by an award of contract damages resulting from wrongful discharge, even if he were awarded the expected retirement benefit. The jury was entitled to believe that K Mart did more than merely discharge wrongfully and without cause, that it went further. After involving itself in a relationship of trust and special reliance between itself and its employee and allowing the employee to rely and depend on continued employment and retirement benefits, the

company, to serve its own financial ends, wrongfully and in bad faith, breached the employment agreement. The jury specifically found this reliance and concluded that K Mart was guilty of bad faith. Under such circumstances we are loathe to set aside the tort verdict on the ground that K Mart's misconduct does not rise to the level of wrong encompassed by the definition of this tort as expressed in *United States Fidelity* and other Nevada cases.

Given the relationship of the parties and the circumstances of this case, it does not appear that K Mart would be held adequately accountable by mere payment of contract damages. A thief or embezzler is not thought to be held accountable for his crime by merely being required to return the stolen or embezzled goods; an additional penalty must be imposed. Merely having to compensate for its breach of contract would not hold K Mart and other similarly situated employers accountable for this kind of bad faith.

Similarly, contract damages do not make the Ponsocks of the world whole. Merely giving to Ponsock that to which he is contractually entitled does not make him whole, does not compensate him for the injury, the insult, the wrong suffered at the hands of K Mart. For these reasons we find that the jury's express finding that K Mart was guilty of bad faith was supported by the evidence and that the district court's allowance of bad faith tort damages in this case was without error.

## Punitive Damages

The jury awarded Ponsock $50,000.00 in punitive damages. K Mart claims that it was error to instruct the jury on punitive damages. The instruction on this point provided that punitive damages should be awarded *only* if (1) K Mart breached its duty of good faith and fair dealing *and* (2) that it was guilty of "actual oppression, fraud or malice." By awarding punitive damages the jury must again be seen to have found K Mart guilty of bad faith and, as well, to have found K Mart guilty of oppression, fraud or malice.

There is no difficulty in upholding the jury's finding oppression and malice in this record. The legitimate inference that K Mart fired Ponsock to deprive him of his pension reeks of oppression and malice. In addition, we note, that when Ponsock applied for relief at the Unemployment Security Department, K Mart characterized Ponsock as a thief which, under the circumstances of this case, could well have been construed as a wilfully defamatory act. These facts, coupled with the course of conduct described above, justify a jury finding of malice and oppression. Certainly it cannot be said as a matter of law that these elements are absent from the record. The punitive damage award will be affirmed.

Although all legal justification for allowance of punitive damages were present, we decided to disallow punitive damages in *Hansen v. Harrah's*, above, because it would not be fair. In *Hansen* we held that although punitive damages might properly be awarded in a retaliatory discharge case where the employee could demonstrate malicious, oppressive or fraudulent conduct on the part of the employer, it would be unfair to punish employers for conduct "which they could not have known beforehand was actionable in this jurisdiction." 100 Nev. at 65, 675 P.2d at 397.

If, as the jury was entitled to infer, K Mart maliciously and oppressively discharged Ponsock in order to defeat his retirement entitlement, K Mart cannot very well argue that it could not appreciate the unlawful nature of its bad faith and that it should not therefore be punished for it.

The use of punitive damages in appropriate cases of breach of the duty of good faith and fair dealing expresses society's disapproval of exploitation by a superior power and creates a strong incentive for employers to conform to clearly defined legal duties. Such duties are so explicit and so subject of common understanding as to justify the punitive award.

Other contentions of K Mart have been considered and rejected. The judgment of the district court is affirmed.

GUNDERSON, C. J., and STEFFEN, YOUNG and MOWBRAY, JJ., concur.