*1180 OPINION
By the Court,
Springer, J.:
In this appeal we are called upon to resolve three separate issues. The first issue is whether respondents Michael Bullard and Ricky Hammer, employees of appellant-defendant Bigelow Holding Company have made out a prima facie case for tortious discharge.[1] We conclude that they have not and reverse the tortious discharge judgment. The second issue is whether the judgments for wrongful eviction in favor of Bullard and Hammer can stand under NRS 118A.180(2)(h), which precludes a wrongful eviction action by an employee “whose right to occupancy is solely conditional upon employment.” We conclude that the wrongful eviction judgments in favor of Bullard and Hammer are valid and affirm them. The third issue is whether the judgment for assault and battery in favor of Susan Vaughn is supported by the evidence. On this issue we rule in favor of Vaughn and affirm the judgment of the trial court.

THE TORTIOUS DISCHARGE CLAIMS

Bullard and Hammer have recovered judgment for tortious *1181 discharge based on a claim that they were discharged because of their objection to certain racial policies and activities on the part of their employer, Bigelow Holding Company. Bullard and Hammer were, uncontestably, at-will employees and were subject to dismissal by their employer Bigelow Holding Company at any time and for any reason or for no reason at all. D’Angelo v. Gardner (Western States v. Jones),[2] 107 Nev. 704, 711-12, 819 P.2d 206, 212 (1991); K Mart v. Ponsock, 103 Nev. 39, 47, 732 P.2d 1364, 1369 (1987). The only exception to the general rule that at-will employees can be dismissed without cause is the so-called public policy exception discussed in Western States, a case in which tort liability arose out of an employer’s dismissing an employee for refusing to follow his employer’s orders to work in an area that would have been dangerous to him. In Western States we ruled that the dismissal of a worker for refusing to work in a dangerous workplace was contrary to public policy, that an employer did not have the right to discharge an employee under such circumstances and that doing so was tortious misconduct on the part of the employer. It is “violative of public policy for an employer to dismiss an employee for refusing to work under conditions unreasonably dangerous to the employee.” Id. at 718, 819 P.2d at 216.
Other examples of tortious discharge are found in Hansen v. Harrah’s, 100 Nev. 60, 675 P.2d 394 (1984), in which the employer dismissed the employee for filing an industrial insurance compensation claim, and Hentzel v. Singer Co., 138 Cal. App. 3d 290 (1982), in which an employee was terminated for refusing to commit perjury. The rationale behind these kinds of tort actions is that, although an employer is free to dismiss an at-will employee under almost any circumstances, an employer is not entitled to dismiss an employee for a reason that contravenes public policy. This apparent exception to the at-will rule is a narrow one. To prevail, the employee must be able to establish that the dismissal was based upon the employee’s refusing to engage in conduct that was violative of public policy or upon the employee’s engaging in conduct which public policy favors (such as, say, performing jury duty or applying for industrial insurance benefits). Western States, 107 Nev. at 718, 819 P.2d at 215-16. For example, in the Western States case, if the employer had *1182 dismissed Mr. Jones for employee misconduct that had no relationship to Mr. Jones’ refusal to enter the dangerous cyanide zone when he had an open surgical wound, tortious discharge would not lie. The gravamen of the tort is the employer’s improperly dismissing an employee for public policy-related causes.
The jury instruction in this case reflects the law on the subject. Instruction No. 36 instructed the jury that in this particular case there must be a “refusal or objection” by the employee to practices that were “violative of public policy” which “caused Defendants to terminate Plaintiff’s employment.” (Emphasis added.) In the present case neither of the dismissed employees registered with the employer any objection to or refusal to comply with untoward and racially-discriminatory practices claimed to have been engaged in by the employer. There is strong evidence that Bigelow, as a company, was engaging in racially-discriminatory practices, but there is no evidence that either Bullard or Hammer ever objected to Bigelow about these practices or refused any request or demand by the employer that the employees carry out these kinds of practices on behalf of the employer. If, for example, Bigelow had directed Bullard or Hammer to engage in any of the discriminatory practices or they would be fired, this would be an entirely different case; but there is no evidence that either employee was ever directed to engage in discriminatory practices, much less evidence that either was fired because he refused, as an employee, to engage in such practices or because he objected to such practices by Bigelow.
There is really no issue here with regard to Hammer. Bigelow claims to have dismissed him for unsatisfactory work performance. Bigelow might have fired Hammer, an at-will employee, because management did not like him or for any other reason. There is no connection between Hammer’s dismissal and any of the discriminatory practices that were alleged to be conducted by Bigelow. With regard to Bullard, however, the situation is a little different. Bullard thinks that he was dismissed because he made a remark to a fellow employee, Carol Swenson, that “Blacks have rights too.” Bullard thinks that this remark got back to one of the Bigelow managers, Donna Dallman, and that her decision to dismiss him was probably based on his having made the quoted statement to Carol Swenson.[3]
*1183 When Dallman terminated Bullard “on second thought,” (see footnote 3) she gave no reason for the termination. An at-will employment “may be terminated at any time for any reason or for no reason.” Southwest Gas v. Ahmad, 99 Nev. 595, 596, 668 P.2d 261, 262 (1983). An employer may dismiss an at-will employee on mere “‘whim.’” Sands Regent v. Valgardson, 105 Nev. 436, 439, 777 P.2d 898, 899 (1989) (quoting Smith v. Cladianos, 104 Nev. 67, 69, 752 P.2d 233, 234 (1988). When one reads the dialogue between Dallman and Bullard (footnote 3), it would appear that when Dallman finally decided to dismiss Bullard, it was on the basis of her personal dislike for him and her general dissatisfaction with Bullard as an employee. Even if that dissatisfaction were based (as Bullard suspects) largely upon his “Blacks-have-rights-too” remark to Carol Swenson, Dallman still had the perfect right to dismiss him at her whim, for no reason or even for “wrong” reasons, so long as she did not dismiss him for a refusal to carry out employment tasks that were contrary to public policy or for his performing acts that were favored by public policy. See Western States, above.
It could be inferred from the evidence in this case that the Bigelow company had in fact adopted a rental policy of discriminating against African-Americans. It has been claimed that agents of Bigelow were instructed to use deception and subterfuge to prevent African-Americans from becoming tenants in Bigelow rentals. Bullard was probably well aware of this situation and was perhaps one of the agents of Bigelow who assisted in carrying out this discriminatory policy. There is no evidence that Bullard at some juncture decided to divorce himself from these ugly practices and to oppose Bigelow’s racist policies. When Bullard was given an opportunity to object when he was asked by Dallman if *1184 he had any “problem” with his employment, he quickly answered in the negative. It may be true that Bullard apparently felt some disapproval of the way his employer was treating African-Americans and, in an aside, expressed his disapproval to one of his co-workers; but this expression of disapproval was made to a co-worker, and not to the company or its management. This comment to another employee is a far cry from his having refused to carry out directions that were violative of public policy.
As appears from the conversation at the time of Bullard’s dismissal, Ms. Dallman did not express any reasons for terminating Bullard. Whether Bullard’s theory that he was fired because of the remark he made to a fellow employee is supported by the evidence or not, we are willing to assume for the purpose of this opinion that Bullard’s conversation with Carol Swenson was what led to his termination. If this fact is accepted as true, then it could be inferred that Dallman dismissed Bullard because of what she saw as Bullard’s overly sympathetic attitude toward African-Americans. (Or, as Ms. Dallman put it, because she thought that Bullard might have been a “nigger lover.”) Whether the cause of the dismissal was because Ms. Dallman was generally dissatisfied or because Ms. Dallman did not want in her employ anyone who she suspected was sympathetic to African-Americans, Ms. Dallman was still entitled to terminate the at-will employment.
If the reason for termination was narrowed to Bullard’s having made the statement itself, it would appear that the statement about African-Americans having rights was a pretty general and innocuous expression of opinion and that it was merely part of a conversation with a fellow worker. Even if we were to read something rebellious about Bullard’s comment that “Blacks have rights too,” it is important to remember that the remark was not made to management and was not made in opposition or objection to the company’s supposed discriminatory policies. Bullard’s conversation with Carol Swenson could not be described in any sense as being insubordinate or “disloyal.”[4] Bullard’s opinion about African-Americans’ rights might have made Dallman angry *1185 or unwilling to continue Bullard in Bigelow’s employ, but this certainly was not anything like her having dismissed Bullard for refusing to do something contrary to public policy that the company directed him to do. Neither Dallman nor the Bigelow company required Bullard to do anything untoward, and if the reason for termination (as appears to be the case) was that Bullard, in the eyes of Dallman, was a bad person, a person who was sympathetic to African-Americans, Dallman had the right to dismiss Bullard as an at-will employee.
The situation here is very much different from our cases on tortious discharge. These cases involve employer-employee confrontations in which the employee, in opposition to the employer’s directions or policies, does something or refuses to do something that public policy entitles or empowers the employee to do or not to do. When an employer dismisses an employee for the employee’s performing or refusing to perform public policy-favored actions, then an action for tortious discharge arises. Western States, 107 Nev. at 718, 819 P.2d at 216 (“tortious discharges may arise when an employer dismisses an employee in retaliation for the employee’s doing of acts which are consistent with or supportive of sound public policy and the common good” (emphasis added)); see also, e.g., Bushko v. Miller Brewing Co., 396 N.W.2d 167, 171 (Wis. 1986) (when an employee acts in a manner consistent with public policy, without an employer’s directive to violate public policy, discharge for such conduct will not serve as the basis for a wrongful discharge claim); accord Paca v. K-Mart Corp., 775 P.2d 245 (N.M. 1989) (“Wrongful discharge requires proof that an employee performed an act favored by public policy or failed to perform a disfavored act. ”) (emphasis added).
The dissent disagrees with the majority opinion on the ground that “discriminating against tenants because of their race is against the public policy of this state.” Of this there can be no doubt, but it should be remembered that the gist of the wrongful discharge actions being asserted here has nothing to do with Bigelow’s supposed discriminatory practices against prospective Black tenants; rather, Bullard charges that his dismissal was somehow related to his statement that “Blacks have rights too.” Whether Bigelow was “discriminating against tenants because of their race” or not has nothing to do with Bullard’s tortious discharge case; and it would not have anything to do with it unless Bullard had established the fact that he was dismissed for refusal to condone or cooperate in such policies.
Without citing any authority, the dissent proclaims that “[i]f an employee is terminated for objecting to such a policy, his *1186 termination is wrongful.” It is possible, of course, that if an employee “objects” to his employer about company actions that are contrary to public policy, and these objections are used as grounds for dismissing him, he might be able to structure some kind of tortious discharge action, depending on the nature of the objection and depending on whether his objections amount to a refusal to violate the public policy of this state. In Western States, Mr. Jones might be said to have “objected” to going into the cyanide pit, but the real essence of Jones’ tortious discharge action was not his objection to company policies but his outright refusal to accede to his employer’s wrongful employment practices and the employer’s subsequent retaliatory dismissal of Jones. Aside from the fact that Bullard never expressed any “objection” to his employer, the dissenting justice should again be reminded that, under Western States, a tortious discharge will lie only if the discharge is based on the employee’s refusal to comply with an employer’s demand that the employee engage in improper activity or is based on an employee’s acts which public policy favors. The Western States rule does not apply to dismissals based on an employee’s merely having expressed disapproval of company policies to a third person; and it would be a major expansion of the Western States rule for this court to say that an employee has a tortious discharge action any time he can show that one of the grounds of his discharge was his having said something to a fellow employee that might be seen by the employer as being inconsistent with wrongful company policy or actions. Such a ruling would invite a large number of tortious discharge cases to be filed on the basis of claims that the employer fired the employee merely for not agreeing with company decisions or for expressing vague objections to what the employee might have seen as untoward company policy. Such expansive claims cannot be countenanced. As appears throughout this opinion, the wrongful discharge must be based on the employee’s having done something or not done something that relates to the public policy of this state. Merely “objecting” to company policies, especially when the objection is made in the form of an aside to a fellow employee rather than in the form of a protest or grievance to management, is not the kind of conduct, the kind of public policy-related confrontation between employer and employee, that can provide a basis for a tortious discharge action. Finally, even if we were to adopt a rule that allowed a tortious discharge action to be filed based on an employee’s merely “objecting” to company policies or actions, we again note that in this case Bullard did not actually object to his *1187 employer about anything that Bigelow was doing; he merely voiced displeasure on the subject to another employee.[5]
In sum, then, we do not deem it to be consistent with the employment law of this state to hold that an employee’s merely expressing to a fellow employee or some third person disapproval of or “objection” to company policy that is claimed to be contrary to pubic policy (as distinguished from refusal to carry out that policy) can be the predicate for a tortious discharge action. Dallman fired Bullard not for what he did (such as refusing to carry out ugly and unlawful racist policies for the company or even for “objecting” to such policies) but rather, at worst, for what, in her mind, Bullard yvas, namely a person she deemed to be unworthy of further employment because of an expressed sympathy for black tenants. Dallman had, under our at-will employment law, the right to fire Bullard because she did not like people like him, people who are sympathetic to African-Americans. She had the right to fire him for any reason. The only possible exception to this case, to Dallman’s absolute right to fire Bullard and to the general at-will rule that is applicable here, would have been if she fired him because he refused to carry out company directives that he engage in unlawful discriminatory rental policies. There is absolutely no evidence of this; consequently, no tortious discharge action can lie in this case.
We reverse the judgment for compensatory and punitive damages that were awarded to Bullard and Hammer for tortious discharge.

HAMMER’S WRONGFUL EVICTION

With regard to the wrongful eviction claims, Bigelow Holding Company contends that the jury improperly awarded Hammer $1,000.00 in damages for wrongful eviction, because Hammer was provided with the apartment ás part of his compensation for working for South Cove. Bigelow concludes that since the occu *1188 pation of the apartment was contingent on his employment, appellant William T. Millhouse lawfully requested Hammer to move once his employment had been terminated, and that therefore, NRS 118A.180(2)(h) precludes Hammer from obtaining any judgment for wrongful eviction.
NRS 118A.180 states the following in pertinent part:
1. Except as provided in subsection 2, this chapter applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit or premises located within this state.
2. This chapter does not apply to:
(h) Occupancy by an employee of a landlord whose right to occupancy is solely conditional upon employment in or about the premises.
At the time Hammer moved into the apartment, he was not employed at South Cove. Hammer lived at South Cove for approximately three months before Donna Dallman hired him, and for those three months, he paid rent for the apartment. It was only after Hammer began working at South Cove that Donna Dallman credited him rent in exchange for his work. Moreover, Hammer testified that he understood from Donna Dallman that if his employment were to terminate for any reason, he would remain in the apartment and “pay rent just like anyone else.” In light of the foregoing, we conclude that Hammer’s occupancy was not “solely conditional upon employment in or about the premises,” and that NRS 118A.180(2)(h) therefore does not preclude Hammer’s recovery for wrongful eviction. We affirm the $1,000.00 judgment for wrongful eviction.

SUSAN VAUGHN’S ASSAULT AND BATTERY CLAIM

On August 13, 1987, Bigelow managerial agents Donna Dallman and A.J. Dallman evicted Susan Vaughn, a former employee of Bigelow, from one of the Bigelow rental projects. Vaughn testified that Donna and A.J. Dallman and Ray Sutton (“Sutton”), an ex-South Cove security guard, came to her apartment and advised her that if she did not pay her rent immediately, they were going to come in and remove everything from the apartment. The Dallmans and Sutton left and came back a few minutes later. Upon their return, Vaughn denied them entry, and Sutton put his foot in the door and tried to force his way into the apartment. Vaughn testified that she put her hand on Sutton’s chest in an effort to prevent him from coming in, and in response, *1189 Sutton pulled a gun on her, pushed it in her stomach and said, “You push me again, bitch, and I’ll bash your face in.” A.J. Dallman immediately grabbed Sutton, and they left Vaughn’s apartment.
Bigelow contends that there was insufficient evidence to support the jury’s award of punitive damages against Bigelow based on Vaughn’s assault and battery claims.[6] Bigelow contends that Vaughn failed to present any evidence that when Sutton pulled a gun on Vaughn, Sutton was acting under the control or direction of Bigelow resident managers, Donna and A.J. Dallman. Bigelow argues that in order for a jury to assess punitive damages against an employer for the employee’s actions, either the managing or supervisory personnel of the employer must commit the action or have approved the tortious acts. According to Bigelow, our opinion in Cerminara v. California Hotel & Casino, 104 Nev. 372, 760 P.2d 108 (1988), supports this position.
Vaughn contends that she presented “at a minimum, strong circumstantial evidence that Ray Sutton’s entry into Vaughn’s residence was directed or approved by the resident managers.” Vaughn contends that after Sutton resigned from Bigelow, he remained a resident of South Cove, and at the Dallmans’ request, Sutton continued to train other South Cove security personnel. Further, on the day in question, Vaughn testified that Sutton was the first to enter her apartment and that the Dallmans were right behind him, and when Vaughn attempted to stop them from entering, Sutton pulled a gun on Vaughn and pushed it into her stomach. Vaughn further testified that A.J. Dallman restrained Sutton, and then they left.
Bigelow has failed to demonstrate that the jury’s determination was clearly erroneous. It appears from the record that all of the parties acknowledge that Sutton at least brandished a gun and threatened Vaughn and only dispute Sutton’s status at the time of the incident — acting at the direction of the resident managers as opposed to being an independent actor. The jury had sufficient evidence to determine that Sutton acted on behalf of Bigelow when he attempted to force his way into Vaughn’s apartment and pulled a gun on her; at the time of the incident, Sutton entered Vaughn’s apartment with the South Cove resident managers, and *1190 assisted the managers with Vaughn’s eviction. Moreover, Sutton had been a security guard for South Cove in the past and was still doing part-time security work for them. The jury, therefore, did not err in awarding punitive damages.
Steffen, C. J., and Young, J., concur.

The jury verdicts and the consequent judgments were based on “wrongful termination” of employment. “Wrongful termination” may be of a contractual or tortious nature. It is apparent that the judgments against Bullard and Hammer arose out of tort claims and that they correspond to what this court has termed “tortious discharge,” terminations that are violative of public policy. See, e. g., D’Angelo v. Gardner, 107 Nev. 704, 711, 819 P.2d 206, 212 (1991). We refer to this tort throughout the opinion as “tortious discharge.”

In D’Angelo, we consolidated two cases: D'Angelo v. Gardner and Western States Mineral Corp. v. Jones. The plaintiff in D’Angelo sued his employer for wrongful discharge. The plaintiff in Western States sued his employer for wrongful termination. Although the cases are consolidated under the case name of D’Angelo v. Gardner, for the purposes of this opinion, we will refer to the case as Western States to avoid any confusion.

At the time Dallman dismissed Bullard, their conversation, as recalled by Bullard, went like this:
Q. How were you terminated?
A. We had three black males came [sic] on the property. Carol Swenson radioed Donna Dollman [sic] on her radio— ... I told Carol that blacks had'rights, too. Approximately five to ten *1183 minutes passed. Donna came into the office. Carol and Donna conversed. I don’t know what they said.
Donna walks up to where I’m sitting, picks up the piece of paper that I’m writing on, and she said, “What’s your fucking problem?”
I said, “I don’t have a problem.”
She said, “I think you do.” She said, “I think you’re a fucking nigger lover. Sit your God damn ass down on that fucking stool, shut your mouth, and do your fucking work.”
Q. What happened next?
A. Then she said, “On second thought, get your fucking ass out of here. I don’t want you working for me anymore.”
Q. And what was the time span between those two statements by Mrs. Dollman [sic]?
A. Not even 30 seconds.
Q. Why did you make the statement, “Blacks have rights, too”?
A. Because I knew that they were fixing to physically assault the black males to get them off the property.

Bullard’s protest, or, better, protestation (if, indeed it can be called that) was pretty sickly. He apparently was not willing to make such statements in the presence of Dallman. When Dallman asked him if he had “a problem” with the company he was quick to deny it. If Bullard had ever “stood up” to Dallman and said something like, “Look here, Dallman, I am sick and tired of the way you treat Blacks around here, and I am not going to put up with it any longer,” he might have had a better case. He did not come close to doing this, and as a result he cannot bring himself under the Western States rule and show that he was dismissed because he did or refused to do something in his employment that offended this state’s public policy.

The dissent succeeds in showing that Bigelow and its associates are a crowd that may not be entitled to very much sympathy; still, we must be careful not to allow any hostility towards them or their pernicious policies to cloud judicial decision-making. The dissent has not shown that Bullard did anything more than make a passing comment to a co-worker; Hammer did not even do that. Neither man refused to engage in discriminatory practices nor took any action to stop those discriminatory practices. In fact, when asked by Donna Dallman whether he had a problem (possibly in reference to Bullard’s comment that “Blacks have rights too”), Bullard replied, as we know, “I don’t have a problem.”

The jury found that Sutton committed an assault and battery against Vaughn, that Sutton acted as an agent or employee of Bigelow, and that when he committed the torts, Sutton acted within the scope of his employment. The jury assessed compensatory damages in favor of Vaughn and against Ray Sutton in the amount of $1,250.00 for the assault and in the amount of $1,250.00 for the battery. In addition, the jury via special verdict awarded Vaughn $10,000.00 in punitive damages against Bigelow for the assault and $15,000.00 in punitive damages against Bigelow for the battery.